FERN PITCHER v. BILLY SCHOCH, Appellant.—139 S. W. (2d) 463.

Division Two, May 4, 1940.

*Vane Thurlo, Cowgill & Popham* and *Guy Green, Jr.,* for appellant.

1188

*Hart & Joyce, H. K. West* and *W. A. Franken* for respondent.

COOLEY, C.—Respondent, plaintiff below, recovered judgment for $18,000 against appellant, defendant below, as damages for personal injuries sustained by plaintiff as a result of being struck by an automobile driven by defendant. The appeal presents questions as to submissibility of the case on both primary negligence and negligence under the humanitarian doctrine and as to certain instructions, also some questions as to rulings on evidence and a question as to excessiveness of the verdict.

The accident occurred between eleven o'clock and midnight, December 27, 1936, on a street of the City of Brookfield known as South Main Street, sometimes called Memorial Drive. For brevity and convenience we shall call it Main Street. It is a part of State Highway No. 36. At the point in question it runs approximately north and south and is divided into two traffic lanes, each paved to a width of eighteen feet with a curb on each side of each traffic lane and with a parkway designed to be ornamented with flowers and shrubbery between the two traffic lanes. The east traffic lane is designed, at least generally, for northbound traffic and the west for southbound traffic. There is a sidewalk along the east side of the east lane, next the property line, and similarly one along the west side of the west lane. Between sidewalk and curb on each side of the street there is a "terrace" or "berm" some fifteen feet wide. (We shall speak of it as "terrace.") The total width of Main Street from sidewalk to sidewalk, as we understand the record, is about ninety feet.

In this case we have to do with the east traffic lane. Plaintiff was injured while crossing that lane, about two hundred feet south of a street called Canal Street, at the intersection of which with Main Street she had alighted from an automobile and had started south on the east sidewalk of Main Street. She lived on the west side of Main Street but when she alighted from the automobile she observed a man walking south on the west sidewalk whom she did not then recognize. Thinking he might be a stranger or possibly "a tramp" she kept to the east side and went southward on the east sidewalk till she reached a point nearly opposite her home, when she recognized the man as a Mr. Thornton, a neighbor whom she knew, and decided to cross over and walk the rest of the way home with him. Before leaving the sidewalk she saw the headlights of a car coming northward in the east traffic lane, then apparently beyond the next intersection to the south. After crossing the terrace and at the curb, just before stepping onto the pavement, she looked south and saw

those headlights, then, as it appeared to her, one hundred to one hundred and fifty feet away, and started across, walking at "an ordinary gait" and without again looking to the south. She testified she thought she had ample time to cross safely. When just about at the middle of that east lane—on the "black line"—she was struck by defendant's automobile. [It should be stated that there was a "black line" on the pavement in the middle of the east traffic lane. Whether because traffic sometimes went both ways in that lane or for other reasons is not shown.]

There was testimony that at the point in question many people habitually crossed Main Street, there being no regular street crossing near. Also testimony from plaintiff and several of her witnesses that it was a clear, moonlight night—no mist or fog—and that the pavement was dry. [Some evidence on defendant's behalf tended to show that the pavement was "moist" and that there was some mist or fog, tending to obscure vision.]

Mr. Thornton testified that he lived on the west side of Main Street, about a block and a half south of Canal Street; that he was going south on the west sidewalk of Main Street and observed "a lady" (afterwards shown to have been plaintiff) going south on the east sidewalk; that he saw the lights of an automobile coming northward; that he saw the woman apparently about to cross the street and "when she got to the curbing" the car was about two hundred and fifty feet from her. The car had "a good pair of lights" which were "showing up on the lady as she was going up that way." He judged the car was coming forty miles an hour. [His qualification to judge the speed of cars does not seem to be questioned.] When "the lady" got to the curb and was about stepping onto the pavement (he had not yet recognized her) he "yelled" to her, "Look out, you are going to be hit," but (as her testimony shows), she did not hear him, and went on across. She was struck at about the black line. The car did not appear to Thornton to "slow up" until it struck plaintiff, though just before it struck her it "turned to the left and skidded," and after striking her "went up onto the parkway (the central 'parkway' between traffic lanes) and traveled about thirty feet after it hit her." He testified, and all of plaintiff's evidence is to the effect, that no horn was sounded nor other warning given before the collision and that the lights of defendant's car were bright. Wilbur Seitz and Herman Crispin were in an automobile going in the same direction as defendant. Something like a quarter of a mile or so south of where plaintiff was struck defendant's car passed Seitz and Crispin who were then driving about thirty-five miles an hour. So far as we can gather from the record Seitz and Crispin continued at about the same speed and defendant drew away from them. Seitz testified that he noticed defendant's car when it hit the curb and he saw "the body or a person looked like was thrown out of the car. That was

our first impression, that it had struck the curbing and some one had been thrown from the car.'' Seitz and Crispin were then three or four hundred yards behind defendant's car. The body they saw was evidently that of plaintiff, since no one was thrown from defendant's car when it hit the curb. Seitz did not see plaintiff as she was crossing the street before she was struck, though he said he was looking ahead.

An ordinance of the City of Brookfield, limiting the speed of automobiles at the point in question to twenty miles per hour, was pleaded and proved.

The Schoch car was a two seated Ford V8 automobile and at the time there were nine young people in it. Four were in the front seat, with Schoch driving, a young lady at his right in the center of the seat and at her right two other young ladies, one sitting on the other's lap. Five young people were in the back seat. The testimony of several of these young people, called as witnesses by defendant, was to the effect that the pavement was ''moist'' and that there was some mist or fog in the air obscuring the windshield so that defendant had to and did have his windshield wiper in operation. It was a single wiper on the left side in front of the steering wheel. Defendant testified that he was driving about twenty-five miles an hour and did not see plaintiff until within about thirty feet of her; that he first saw a dark shadow ''it seemed like about three foot to the right of the (black) line. I couldn't make out whether it was a lady or not until a second later;'' that he then honked his horn, swerved to his left and applied his brakes, all as nearly at one time as he could; that the car skidded, turned to the left, hit the left curbing—''one front wheel entered the park oval and the other front wheel hit the curbing and that swung the car around and it stopped in about a car's length,'' with the left front wheel ''up in the oval,'' the right front wheel against the curbing and the back wheels on the pavement. He said his lights were in good condition and were turned on and while there was some mist or vapor obscuring the windows of the car, yet, with the windshield wiper operating, as it was, he had practically perfect vision through the space it cleared. But he also said that his lights only threw rays ahead about thirty feet; that his lights were ''on bright'' and that his car was a practically new Ford V8, brakes good and in ''perfect working condition.''

The foregoing sufficiently outlines the facts for consideration of the demurrer to the evidence. We think plaintiff made a submissible case as to both primary negligence and negligence under the humanitarian doctrine. It was submitted on both theories. Plaintiff saw the lights of the car as she stepped from the curb to the pavement. It then appeared to her to be one hundred to one hundred and fifty feet away. According to Thornton's testimony it must have been somewhat farther away. Plaintiff saw it from almost directly in

front and naturally, under the circumstances, could not well judge its speed. [See on this point Strauchon v. Met. St. Ry. Co., 232 Mo. 587, 599, 135 S. W. 14.] Plaintiff had a right to assume that the automobile driver would observe the speed ordinance (see Flach v. Ball, 209 Mo. App. 389, 399, 240 S. W. 465, 467 [2]) and would not act negligently. [Hodges v. Chambers, 171 Mo. App. 563, 570, 154 S. W. 429.] Plaintiff had the right to cross Main Street at the point in question. Many people habitually did so. In Meenach v. Crawford (Mo.), 187 S. W. 879, 882 [2, 3] we read:

"Pedestrians have the same rights as drivers of vehicles to use and traverse a highway at all points and are not restricted in crossing streets at the intersection of two streets or avenues; such fact, however, might have some bearing upon the question of contributory negligence."

■ The statute (Sec. 7775, R. S. 1929, Mo. Stat. Ann., p. 5197), required of automobile drivers that they drive in a careful and prudent manner and exercise the highest degree of care and drive at a rate of speed such as not to endanger any person. It was defendant's duty to observe the speed ordinance and, in the exercise of the highest degree of care, it certainly was incumbent on him, when driving on a much used street of a city, to keep a careful lookout ahead for persons who might be on or crossing the street, whether or not enjoined so to do by statute or ordinance, and if necessary to give timely warning of his approach to persons apparently not aware thereof who might be about to cross his path.

■ As we have said we think plaintiff might reasonably have assumed that the driver of the car whose lights she saw would observe the speed ordinance and use the care required of him by the law. Had defendant been driving twenty miles per hour and was only one hundred feet south of plaintiff when she stepped from the curb onto the pavement it would have taken him approximately three and one-half seconds to travel that one hundred feet—proportionately longer if he was one hundred and fifty feet away. Plaintiff was walking at an "ordinary gait,"—(miles per hour not shown). If it was, say, four miles per hour she would have traveled in three and one-half seconds approximately twenty and one-half feet, and would have been across the pavement. If we say an "ordinary gait" was only at the rate of three miles an hour—which seems conservative enough (see McGowan v. Wells, 324 Mo. 652, 24 S. W. (2d) 633, 639 [6])—plaintiff at that rate would have traveled, if our calculations are correct, a little more than fifteen feet—enough to have put her out of the direct path of the automobile, because the pavement was eighteen feet wide and defendant testified that as he approached and when he discovered plaintiff his *left* wheels were a "couple of feet" over, that is to his left, of the middle black line, which would mean about eleven feet west of the east curb. Plaintiff would have been past that point if

she had been walking only three miles an hour and if the automobile had been traveling only twenty miles an hour and was only one hundred feet from her when she started to cross. If the automobile was one hundred and fifty feet from her her margin of safety was proportionately greater.

We do not mean to hold that questions of this kind can always or necessarily be determined by nice or exact mathematical calculations. All the circumstances and the natural reactions and conduct to be expected of ordinary people in a given situation must be considered. In the circumstances of the instant case we think the question of plaintiff's alleged contributory negligence was for the jury.

On the issue of negligence under the humanitarian doctrine it seems to us plaintiff clearly made a submissible case. Appellant argues that defendant did not and could not see plaintiff in a position of imminent peril until within thirty feet of her and that thereafter he did everything he could to avoid striking her. But this argument seems to be based on defendant's evidence. We agree that negligence under the humanitarian doctrine does not include *antecedent* negligence. But under that doctrine, as applied in this State, a person is liable for failure to exercise the requisite care after he discovers or, under the circumstances, could and should discover another in imminent peril and oblivious thereof or unable to extricate himself therefrom. It is not enough, in order to exculpate defendant, that he did not see plaintiff until within thirty feet of her. There remains the question whether or not he could and should have seen her in obvious peril sooner and in time thereafter to have avoided striking her. As we have pointed out it was defendant's duty to keep a lookout for persons on the street. Plaintiff's evidence tends to show the night was clear, moonlight, no mist or fog, and the pavement dry. Of course, in ruling a demurrer to the evidence, the court takes as true the evidence favorable to the plaintiff, with such favorable inferences as may reasonably be drawn from facts proved. Plaintiff and Thornton saw each other across a ninety-foot street. Plaintiff, before she started to cross the street, actually recognized Thornton—and all this without the aid of automobile headlights. Seitz, three or four hundred *yards* behind defendant's car, saw it strike the curb and saw *a body,* which looked to him like it had been thrown from the car. If it appeared to him to have been thrown from the car he could hardly have seen it in the glare of defendant's headlights because the body of the car was, of course, behind the headlights. At any rate, all these circumstances, it seems to us, present questions for the jury as to whether or not defendant did discover or could and should have discovered plaintiff in peril in time thereafter to have avoided injuring her. Moreover, it is to be borne in mind that plaintiff was struck approximately at the middle of the eighteen-foot pavement— about on the black line. Defendant's car was traveling with its left

wheels only "a couple of feet" west of that line—or as he stated at another time, "two or three feet." Plaintiff needed but a step or so to be in the clear. According to plaintiff's evidence no warning of the approach of the automobile was given. A warning might have caused plaintiff to accelerate her pace and thus escape injury, or a slight slackening of the speed of the automobile might have averted the injury. Also there was ample room for defendant to swerve to his right and pass behind plaintiff—east of the black line—without striking her. The jury were not obliged to believe and may not have believed defendant's testimony that he could not see an object, such as a person crossing the street, more than thirty feet ahead of him.

It is argued that there was no evidence as to the distance in which defendant's car could have been stopped. No witness testified directly as to the distance in which it *could be* stopped but there was evidence as to the distance in which it *was* stopped. Defendant said he applied his brakes when he saw plaintiff about thirty feet ahead of him and his car stopped in about a car length after he struck her. Thornton said he thought the car went not over thirty feet after it struck plaintiff. So there was evidence from which the jury could determine approximately the distance in which the car could have been stopped—at least that it could have been stopped within the distance at which defendant should have discovered plaintiff in or coming into a perilous position; and in any event that defendant could have slackened his speed sufficiently to allow plaintiff to pass safely. It would have required but a slight slackening of speed, as has been shown.

Appellant complains of plaintiff's Instruction No. 3 submitting the humanitarian theory because it authorized recovery if plaintiff was in imminent peril, etc., observed or observable to defendant, etc., and defendant negligently failed to sound his horn, *or* to stop, *or* to slacken speed, *or* to change his course, and that the "doing of one or more of those acts" would have avoided the injury, etc. The complaint is that the instruction, submitting the alleged acts of negligence in the atlernative or disjunctive, authorized recovery if the jury found any one or more of said acts in plaintiff's favor, and that the evidence did not disclose or tend to prove any distance within which the car could have been stopped or its speed checked or its course changed, so as to avert the injury to plaintiff. We think what we have said above sufficiently disposes of this contention. It is ruled against appellant. The same ruling applies to appellant's complaint of plaintiff's Instruction No. 5, a so-called "last chance" instruction, and for like reasons.

Appellant also complains of plaintiff's Instruction No. 4, referring to the "speed ordinance" and primary negligence for that "there was no causal connection between the negligence and the injury and

plaintiff was guilty of contributory negligenct as a matter of law.'' We think what we have said above sufficiently disposes of this contention. It also is ruled against appellant.

■ Complaint is made because the court refused to sustain defendant's motion to discharge the jury on account of a question propounded by plaintiff's counsel to her witness, Crispin, and Crispin's answer thereto. After testifying in chief about defendant's car passing him on the highway some distance south of the place of the collision and the speed, etc., and seeing defendant's car "swerve around" when it hit the curb and some other incidents, he was taken in hand by defendant's counsel for cross-examination. Defendant's counsel asked him:

"Q. You remember a few days after this accident a young attorney by the name of Divilbiss taking a statement from you? You remember signing your name to a statement? A. Yes, sir.''

He was then cross-examined as to what he had said in that statement. The cross-examination developed some contradictions between what he had said in the statement and his testimony at the trial. Defendant's counsel, though having the written statement in his possession, did not show it to the witness and, though requested by plaintiff's counsel to show it to him (counsel), declined to do so. Then, on redirect examination, plaintiff's counsel asked, "Who was Mr. Divilbiss?" and the witness answered, "He said he was attorney for the insurance company, out of Kansas City." Thereupon defendant's counsel said, "We object. Counsel deliberately injects something improper into this matter, and ask that the jury be discharged." The jury was then withdrawn and in the absence of the jury there was an argument before the court. Defendant claimed that plaintiff's counsel had deliberately and purposely introduced a false issue, the question of insurance, into the case, for the purpose of obtaining "an improper, unfair and prejudicial answer," and again asked that the jury be discharged "because of the misconduct of counsel and because of injecting that question into this case." Counsel for plaintiff denied any such purpose or intent, said he assumed and thought he had the right to believe, from certain prior testimony in the case, that Divilbiss was attorney for the defendant, Schoch, and in answer to questions from the court asserted that the witness had never told him and he did not know, before calling the witness, that the witness would say Divilbiss had told him he represented an insurance company and he (counsel) had not anticipated that Crispin would give the answer which he did give. After this colloquy between court and counsel the jury was recalled and the court overruled defendant's motion to discharge the jury, defendant excepting.

There had been testimony from which plaintiff's counsel could reasonably assume that Divilbiss represented defendant, and none

indicating that he represented an insurance company. A Mr. Gress, photographer, who had taken some photographs (introduced in evidence without objection) had testified that he took some of the photographs and made certain measurements at the request of Mr. Divilbiss, who he believed lived in Kansas City and represented Mr. Schoch. He said Divilbiss visited him in Brookfield and "I made them (certain photographs) at his request for Mr. Schoch." Later in his testimony, when asked directly if he knew who Mr. Divilbiss was, what was his profession or whether he was representing Schoch, he said he did not.

The question propounded to and answered by Crispin was not objected to until it had been answered and there was then no motion made to strike out the answer or to direct the jury to disregard it. But, as pointed out above, defendant moved to have the jury discharged. In this connection, in order to give a full understanding of this issue, we quote an instruction, No. 9, given by the court at defendant's request:

"The Court instructs the jury as regards an answer by the witness Chrisman (Crispin) to the effect that someone in conversation made reference to an insurance company, that you will not consider said answer, and same is by the Court withdrawn from your consideration.

"There is no evidence whatever before you in the case that any insurance company is involved here, in any way, nor is any insurance company a party to these proceedings. Your oaths as jurors require you to decide the issues solely between the individual parties to the suit and entirely on the evidence before you, and any consideration by you of the question of insurance or no insurance would be outside the evidence and issues before you and would be highly improper and contrary to and incompatible with the wholesome requirement of the law that even justice be administered alike to all litigants coming into our courts."

In requesting the above instruction, No. 9, defendant expressly and clearly stated to the court that he was not waiving but was still insisting upon his motion to discharge the jury and was asking said instruction only after the court had refused to grant that motion and after the court had given, over his objections, the instructions asked by plaintiff, and in order to minimize if and so far as possible the "poison" injected into the case (as defendant still contended), by the reference to insurance in Crispin's testimony. In these circumstances we do not consider that defendant, by requesting that instruction, waived his right to urge that his motion to discharge the jury should have been sustained.

This question has given us no little concern. Numerous cases have been written by this court and the Courts of Appeals in which judgments for plaintiffs in damage suits were reversed because the plaintiff had improperly injected into the case and got before the jury the

fact that the defendant carried liability insurance and would not have to pay the judgment, if in favor of the plaintiff—especially so if it appeared that the fact of insurance was purposefully—though, as frequently happens, adroitly—injected into the case. Illustrative see: Rytersky v. O'Brine, 335 Mo. 22, 70 S. W. (2d) 538 (distinguishable, however, on the facts); Olian v. Olian, 332 Mo. 689, 59 S. W. (2d) 673; Allen v. Wilkerson (Mo. App.), 87 S. W. (2d) 1056; Whitman v. Carver, 337 Mo. 1247, 88 S. W. (2d) 885; Hannah v. Butts, 330 Mo. 876, 51 S. W. (2d) 4. Such question should not be injected into a case of this kind, for reasons well recognized and, especially if done intentionally, requires reversal, as pointed out in the cases cited, supra. In the instant case we cannot say that plaintiff's counsel acted in bad faith or with sinister purpose. He disclaimed any knowledge or anticipation of what the witness would say. The trial court, presumably knowing counsel, evidently believed him. Defendant, in his question to Crispin, had referred to Divilbiss as an attorney. Up to that time there had been no reference to Divilbiss as an attorney. Witness Gress had given testimony from which it might be assumed that Divilbiss was acting in some capacity for defendant Schoch. Plaintiff's counsel, we think, may reasonably have assumed that he was so acting and may have wished to make clear that in procuring the written statement from Crispin, Divilbiss was acting as attorney for defendant, since defendant's counsel had referred to him as an attorney. But for that reference and the cross-examination which followed, the question of insurance might not and probably would not have come into the case. Also, the court gave the above quoted instruction, No. 9. If the jury conscientiously observed and followed said instruction they did not allow the suggestion as to insurance to influence their verdict. We are not unmindful that sometimes a direction from the court cannot remove the impression made upon the minds of jurors—the "poison" injected into a case—by improper evidence. Crispin's answer to counsel's question was not really responsive to the question. Counsel for plaintiff did not ask what Divilbiss had said—he only asked, "Who was Mr. Divilbiss?" Perhaps, had defendant promptly objected when the witness started to say, "He said, . . ." the objectionable answer would have been excluded. Be this as it may, and without meaning to intimate lack of diligence on the part of defendant's counsel, we have come to the conclusion, albeit with some dubiousness on the part of the writer, that the ruling of the court below on this question does not justify reversal. If the record before us required us to find that plaintiff's counsel acted in bad faith—purposely injected into the case the question of insurance—we might feel compelled to reach a different result. But the trial court evidently believed to the contrary. That court, knowing the counsel, was in better position to

judge of that matter than are we, and it found that issue in favor of the plaintiff. We rule this point against the appellant.

▮ Contention is made that the court erred in admitting the testimony of witness Beams in rebuttal. A Miss Denton had testified for defendant that she was one of the persons in the front seat of defendant's car, sitting at the right of the driver, to the right of the gear shift lever and in approximately the center of the front seat; that she was about five feet, five inches tall; that her observation was through the windshield, as cleared by the windshield wiper; that she could not see through the right side of the windshield, it being covered with frost. She said that (while talking to her companions) she "happened to glance up" and saw "a form" in front of the car, she judged about thirty feet in front of the car, and that immediately the driver attempted to apply his brakes, honk his horn and "swerve at the same time." It is apparent from her testimony that what she claimed to have seen was through the space cleared by the windshield wiper. Now, regarding Beams' testimony: He qualified as being familiar with the type of car which the evidence showed defendant was driving that night and with the location and operation of the windshield wiper on such car; that he had observed what could be seen in such cars through the space cleared by the windshield wiper; and, over defendant's objection, said that a person of Miss Denton's height, sitting as the evidence tended to show she was sitting (hypothesized in questions) could not, in his opinion, see "looking straight ahead" through the space cleared by the windshield wiper. (Miss Denton's testimony indicates that when she "glanced up" she was looking ahead and her testimony does not show that she leaned over toward the driver so as to see from his viewpoint behind the steering wheel.) Appellant argues that the question was not one for "expert" testimony and that Beams' opinion on that proposition should not have been allowed to go to the jury. We cannot agree. Beams knew the type of car defendant was driving, the location and operation of the windshield wiper, the space it cleared, and the position in the car from which a person could see ahead through that space. [See Dodson v. St. L.-S. F. Ry. Co., 223 Mo. App. 812, 10 S. W. (2d) 528.] Some of the jurors may have known such facts. Maybe all of them did not. And if the facts were so obvious that judicial notice could be taken thereof (which we do not hold) what harm could have resulted to defendant by proof thereof? We rule the point against appellant.

▮ In the course of his opening statement to the jury of facts proposed to be proved defendant's counsel said, "I understand the evidence will show that she was developing very nicely and someone in the hospital there jerked the sheet from under her . . ." at which point he was interrupted by an objection from plaintiff. The jury was excused and the question was argued before the court. *De-*

fendant's counsel offered to show "that while she was in the hospital a short time after this injury, and that at a time when the leg was apparently healing, that some person in the hospital, acting as nurse, jerked the sheet from under her and re-broke the bones in her left leg, as bearing upon the issue here made by the pleadings, whether or not her present condition is the direct result of these injuries originally inflicted."

The court indicated that the offer of proof would be denied, and defendant excepted. That controversy there ended. The jury was recalled and no further mention was made of that matter.

In the trial plaintiff's evidence tended to show that she was taken to a hospital in Brookfield where she remained many weeks; that while she was there she was treated by physicians, whose competency is not questioned, and that she was attended and cared for by registered nurses employed at the hospital, whose qualifications, also, are not disputed. Defendant offered no evidence in the trial to prove that plaintiff had not received proper treatment. His offer in his opening statement was that "some person acting as nurse" jerked the sheet from under her and re-broke the bones in her leg. As we have said the only evidence on that subject was to the effect that the nurses who cared for plaintiff in the hospital were competent, and there was no evidence introduced or offered tending to show that anyone of them was incompetent or negligent.

In Elliott v. Kansas City, 174 Mo. 554, 564, 74 S. W. 617, it is said:

"It seems both upon reason and authority, that when a person is injured by the negligence of another he is bound to use ordinary care to the end of his restoration or cure, and is not responsible for the mistakes of an attending physician, and when he acts in good faith under the direction of such physician, any mistake of the latter in the treatment will not absolve the party whose negligence caused the injury from liability in damages therefor."

Consult also, Hughes v. Maryland Casualty Co. (Mo. App.), 76 S. W. (2d) 1101. We see no reason why the same rule should not apply where an injured person is in a hospital of recognized and questioned standing—as here—and is attended by qualified nurses regularly employed in such hospital. We must rule this contention against appellant.

Lastly we have the urgent insistence of appellant that the verdict and judgment are excessive. In determining this question we must consider it from the standpoint of plaintiff's evidence, which tended to show—She was a single woman—divorced—about 47 years of age, receiving $25 per month alimony from her divorced husband, otherwise earning her own living. Prior to the accident in question her health had been good. After being struck she was unconscious and did not regain consciousness until she found herself in the hospital. She testified she remembered—or knew—nothing until the

doctor told her he was going to give her an anaesthetic and until she came out from under its influence, after the operation, and felt "terrible," found that her left leg was in a cast and her right leg "all bandaged up," her head shaved in places and "I was all patched and stuck up here (indicating) and had something, I don't know what, on my head." It developed that the "something" was some sort of harness arrangement designed to keep her neck in proper position on account of some apparent or supposed injury to her neck. She also said she was in a cast from about her hips, across the abdomen, to a point "up to a higher portion of her body"—across "the pelvic portion" of her body. She said she suffered pain "all the time," from "various portions of her body." "Q. Were you suffering any pain from the region of your abdomen and back? A. I was, yes sir, and still do." She said, "There's a knot there. It's over in the middle of my back." She also said she was taken from the hospital seven times to have X-ray pictures taken; that she suffered and still suffers from headaches and pains in her neck, which she had not suffered from before her injury. She also spoke of a lump, or knot, on her head, under the scalp, which, however, the doctors did not seem to consider serious. There was no evidence of a fracture of the neck or the skull. She was in the hospital from the time of the accident, December 27, 1936, until May 19, 1937—nearly five months, except when taken out for X-ray pictures. The trouble with the back of her neck is "its just right up the spine of the neck and goes on up the head and just causes a severe headache" and at times "makes me sick . . . nauseates me, makes me sick at my stomach," which condition she said still existed at the time of trial. She had other bruises on her body and right leg which were painful but, as we gather from her testimony, seem to have substantially healed. But she said she still has a "knot" at the base of her spine which pains her, —"a heavy ache, just a stabbing pain, . . . it's very seldom that it isn't there." As to her left leg, the one that was broken, she said it is never without pain; she cannot walk on it without a brace which the doctors put on and which she has to wear day and night, and she has to wear a specially made shoe on the left foot. The brace goes up to the middle of her thigh. She cannot walk "very good" unless she uses a crutch and she "doesn't do so good" even with a crutch.

According to doctors and surgeons, called by plaintiff, she suffered a "compound, comminuted fracture" of both bones of the left leg between knee and ankle—a compound fracture being one where the broken bone "the fragments, penetrate to the soft tissues, on the outside"—that is "come outside of the skin." "Compound fracture is where the fragments stick out through the flesh through the outside, the fragments of the bone and joint stick up through the outside of the skin." Comminuted "means where the bone is broken in more

than one piece. . . . Both bones were broken in two different pieces." She also had two scalp wounds which required ten or twelve stitches to close, and other bruises and contusions.

Dr. Enochs, one of plaintiff's physicians at the hospital, testified that she complained of pain in her neck and they put on an "extension"—the "harness" she spoke of, designed to take the tension off the muscles and relieve the pain—"spasm of it." She wore that constantly for three or four days and afterwards three or four hours a day for the next ten days or so. Dr. McLarney, another of plaintiff's physicians, testified as to the character of the fracture and, as to her present condition, "She has a non-union. In certain fractures we have a non-union. . . . By non-union we mean sort of a fibrous knot and bony growth and its not solid and the only thing we can do after a certain length of time is put in a bone graft." He estimated the cost of such further operation would be from $500 to $700, including hospital bills, and that such operation would probably give plaintiff a "serviceable leg from a bone standpoint." There was other medical testimony on behalf of plaintiff to the effect that there is a shortening of about an inch in plaintiff's left leg, but that the bone graft operation, if successful, will probably give her a serviceable leg, which she can bear weight and walk upon, though with still probably a "little limp" and some shortening of the leg (rather slight) and with less free movement than with a normal leg. "There's going to be a little interference with the muscle control of the foot and the tendons are alongside that area." But if the operation is successful she will be able to walk on it and "throw away her brace and crutches."

Plaintiff underwent several operations in the course of her treatment at the Brookfield hospital and at a hospital in Kansas City to which she was taken for further treatment deemed necessary. That she suffered much pain from her injuries is apparent from her testimony and testimony in her behalf. It could hardly be otherwise from the nature and extent of her injuries, as in all such cases. From her testimony it appears she still suffers pain and may continue for some time so to suffer. At the time of the trial her left leg was not by any means normal—she could not use it without the brace and with that only inefficiently and with difficulty and pain. A bone graft operation, if successful, may restore it to substantial usefulness, though probably not to normal condition. She has become obligated, as we understand her testimony, for approximately $1000 for medical, surgical and hospital bills, and a physician who had treated her estimated that the cost of a bone grafting operation, including hospital bill would be $500 to $700, and he thought such operation would be necessary in order that she might have a serviceable leg.

In addition to the leg injury and suffering incident thereto she has had other pains, as above pointed out, and says she still suffers from

nervousness due to her injuries and cannot sleep as well as formerly. But the evidence hardly justifies a finding that her injuries other than to the left leg are permanent.

In Kibble v. Quincy, O. & K. C. R. Co., 285 Mo. 603, 227 S. W. 42, the plaintiff had had this foot and ankle crushed, necessitating amputation. This court held that, "according to a long line of cases," where the only permanent injury was the loss of a limb, an award of damages in excess of $10,000 will not be allowed to stand, and required *remittitur* reducing the judgment to that sum. A like holding was made in Farrar v. Met. St. Ry., 249 Mo. 210, 155 S. W. 439, wherein the plaintiff, a young unmarried woman, had suffered an injury necessitating amputation of her leg below the knee, complained of nervous shock and that the leg still pained her. The judgment for $15,000 was reduced to $10,000.

In Bryant v. Kansas City Rys. Co., 286 Mo. 342, 228 S. W. 472, a child (less than four years old), suffered an injury necessitating amputation of his leg. He secured a verdict for $30,000. The trial court required him to remit $15,000 and entered judgment for $15,000. On appeal this court en banc required a further *remittitur* of $1500, leaving the judgment stand for $13,500. Only four of the seven judges concurred in sustaining the final award for that amount, the other three seemingly being of opinion that it should be reduced to $10,000, as the opinion originally had been written by GRAVES, J., in Division One.

In the instant case plaintiff had some injuries other than to her left leg, but as indicated above it is not definitely shown that they are permanent. The injury to the left leg was severe and after long and painful treatment the leg is not in what could be called serviceable condition. To render it reasonably serviceable another operation is indicated, which *may* have that result, but of course there is the chance that it may not be entirely successful. It will be expensive, requiring skillful surgery and probably long hospitalization. We have considered all these factors, including the expense which plaintiff's evidence tends to show she has already incurred, but we are of opinion that the judgment is excessive by at least $5000. If within ten days plaintiff will remit $5000 of the judgment, as of its date, the judgment will stand affirmed, as of its date, for $13,000. Otherwise it is reversed and the cause is remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.