**Evelyn BOEHMER, Appellant,**

v.

**John BOGGIANO, Respondent.**

**No. 51651.**

Supreme Court of Missouri.

Division No. 2.

Feb. 13, 1967.

Rehearing Denied March 13, 1967.

Max C. Nelson, Harold I. Elbert, Susman, Willer, Rimmel & Elbert, St. Louis, for appellant.

John J. Cole, Fred Leicht, Jr., Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for respondent.

EAGER, Presiding Judge.

This is a suit for personal injuries allegedly suffered in a rear end collision. Plaintiff recovered a verdict of $3,000 on her $100,000 claim and has appealed, asserting specific errors and also that the verdict is totally inadequate. Since there is no contention that the evidence was not sufficient to make a submissible issue of negligence, we shall not recite the facts of the collision in any detail. It occurred in St. Louis County on March 8, 1962, at the junction of Highway 40 and Lindbergh Boulevard;

plaintiff's husband, with whom she was riding, was waiting to enter Lindbergh from the ramp of a cloverleaf. The ramp ran slightly downhill. Defendant's car, also moving on the ramp, concededly struck the Boehmer car from the rear, but there was a vast divergence in the evidence of the parties as to the nature and extent of the impact. Defendant says that his car merely rolled five or six feet from a stop and struck the other car lightly at about five miles an hour; plaintiff and her husband testified that there was a "tremendous jolt" or a "horrible jolt" which knocked the car forward a foot or two. Plaintiff testified that her head was jolted completely back, that she felt a "horrible pop" and that she then went completely forward. The damage to the Boehmer car was relatively slight, consisting of a "pushing in" of the bumper guard, a little damage to the pan underneath, the glass of a taillight broken and its rim dented.

Plaintiff testified: that she felt a "funny sensation" in her neck all the way home; that severe pain developed in her head and neck; that she tried to work the next day, but became nauseated and had to quit; that she went to a chiropractor, then home and to bed; that she continued in such pain for months; that she was unable to sleep in bed, but tried to sleep on the floor; that within a week or so she went to her family doctor who sent her to Dr. Earp, an orthopedist, and that she went to him about four times; that Xrays were taken and that at his suggestion she wore a neck collar which was very uncomfortable; that pain continued in her neck, head, right arm and both shoulders; in June, 1962, she went to Dr. William H. Grundmann, who also specialized in orthopedics. He was suggested by a woman who talked with plaintiff in a grocery store, after noticing that she was wearing a neck collar; at about the same time a girl at her place of employment suggested the name of an attorney and plaintiff called him. The attorney apparently recommended Dr. Grundmann, also. This doctor again took Xrays, administered heat treat-

ments, gave her shots and medication and at times she felt that she was improving. In July, 1962, she was referred to Dr. Jacques Paul Schaerer, a neurologist. This reference was suggested either by Dr. Grundmann or the attorney, or both. Plaintiff went to Dr. Schaerer on one visit; he examined her and told her to continue her conservative treatments with Dr. Grundmann. This she did until September, thinking that at times that she was better, and doing a little of her housework, but with difficulty; in September Dr. Schaerer examined her again, noted her various complaints, and recommended that she undergo a test known as a "discogram" to determine whether she had ruptured cervical discs. During the latter part of September this test was performed. It consisted of the administration of a local anaesthetic, the insertion of a needle into the gelatinous center of the disc, the injection of a dye by means of a smaller needle inserted through the first one, and the prompt taking of Xrays to see whether the dye had leaked out into or through the outer ring or annulus of the disc. In this case the tests were of the two discs between cervical vertebrae four and five and between five and six. The doctor testified that the dye had leaked at both sites to the right and rear and that severe pain was caused, substantially identical to her prior complaints of pain. In this doctor's opinion the test was positive for two ruptured discs, and he testified that it was the most accurate means of diagnosing that condition. The positive diagnosis, in his opinion, resulted from a combination of two elements, namely, the extravasation of the dye, and the creation of severe pain by the test in substantially the same place and of the same type as the prior pain. He indicated that the pain was caused by the contact of the dye with nerve endings in the peripheral areas of the disc. Without going into any considerable detail on the subject, these two discs were later removed by Dr. Schaerer in two separate operations and the vertebrae in each instance fused, i. e., four and five and five and six; one operation was per-

formed in October, 1962, and the other in July, 1963. However, another discogram was performed before the last operation, confirming the rupture of the disc, according to the doctor. The doctor testified that from his observation during surgery, as well as by the tests, the discs were defective. Upon a hypothetical question he testified that, in his opinion, the collision caused the conditions for which he operated. On cross-examination he further testified: that the Xrays prior to the operations showed nothing abnormal, but that these are merely aids in diagnosing a disc injury; that the absence of neurological symptoms did not rule out such an injury; that he was familiar with the studies and experiments of Dr. Earl P. Holt, Jr., and with an article written by him in which he concluded that discography (or the use of the discogram) was an invalid or fallacious test; that he did not agree with those findings and conclusions; that the matter had been discussed or debated between them at a medical meeting; that he did not approve of the techniques used by Dr. Holt in his experiments, giving his reasons. The cross-examination of Dr. Schaerer on those matters was extensive. References will be made later to the objections made to this line of testimony. On redirect examination, plaintiff's counsel established that discography was used by neurologists in perhaps a dozen cities of the United States, and that both neurologists and orthopedists in St. Louis had referred disc cases to the witness; also, that he uses the myelogram as a diagnostic test where there are positive neurological findings, but that there were none here. Dr. Schaerer was born in Switzerland and had received his original medical education there; he had performed residencies in hospitals in the United States, was a member of the staffs of several St. Louis hospitals, belonged to the usual medical societies and was a diplomate of the American Board of Neurosurgery.

The testimony of Dr. Grundmann may be referred to briefly. He first saw plaintiff on June 7, 1962; he detailed her various complaints involving chiefly pain in the head, neck and right shoulder with limitation of motion in the neck and shoulder; she was then wearing a neck collar. He determined that she had a possible disc involvement, and he administered heat, medication and traction, but the traction seemed to aggravate the pain and he stopped it; he also found certain distinctive areas of numbness in portions of her forearm, right palm and fingers which, to him, indicated interference with a nerve. In answer to a hypothetical question he stated that, in his opinion, the collision caused the conditions which he found. He further testified that, while slight trauma is not very likely to injure a disc, such an injury often depends upon the person's condition; that in certain instances almost any jar can cause it, even bending over.

Plaintiff testified further that after the first disc operation some of her pain cleared up and she could sleep in bed but that the pain returned later; that after the second operation most of her pain left, but that she still had occasional pain in her right side and neck, especially upon physical activity. Prior to the accident she was employed regularly in a book bindery, and there was evidence that her annual earnings for a period of five years (1957–1961) varied from $2,890.59 to $3,286.10. She had not worked at this occupation since the accident, but had resumed light housework. She testified that she had suffered some physical ailments and operations prior to the accident, including a peptic ulcer, a partial hysterectomy and appendectomy, a Caesarean section, and occasional colds and flu, but that she was in good health on March 8, 1962. The history taken upon a hospital admittance in June, 1952, when she was twenty-four years old, showed various physical complications, some of which occurred in relatively early years. We need not detail these. She had continued with therapy and rehabilitation treatments after her last disc operation and the doctor who so treated her, testified that she still had pain and discomfort in her neck and right

shoulder, with restriction of motion and other symptoms which, in his opinion, came from pressure on nerve roots in the cervical area at and below her fusions; that her condition in March, 1965, was not as good as in October-November, 1964.

The defendant's evidence consisted largely of medical testimony. As we noted previously, the objections of plaintiff's counsel will be considered later, and separately. Dr. George E. Roulhac, a qualified neurological surgeon, examined plaintiff on December 13, 1963, after her last operation. She then complained of pain in her neck and right shoulder and of occasional pain in her right arm. The doctor made various tests and testified that he found no reason for her pain and no objective changes in her nervous system, and that he thought that she should be able to do her usual work. After some discussion of the methods of diagnosing ruptured discs, he testified that, in his opinion, the use of the discogram was an "unreliable diagnostic procedure," that he did not use it, that its use was not only exceedingly painful but that the dye frequently gave misleading indications. The doctor admitted, on cross-examination, that a few of his "confreres" used the test, and that there are differences of opinion on many medical theories. He further testified: that disturbances of cervical discs are a part of the field of neurosurgeons; that the fusions made here by Dr. Schaerer were a "good job"; that injury to a disc from a collision where plaintiff's head had "popped backwards and then forwards," even with the other car traveling at five miles an hour, would be possible, but that such an injury would ordinarily subside "on its own" unless the disc was already degenerated.

Dr. Earl P. Holt, Jr., a qualified specialist in orthopedic surgery, testified: that he had done extensive surgery on lumbar discs, had made studies of the cervical spine and had treated various injuries in that area; that surgery on cervical discs was ordinarily referred to a neurosurgeon; that in making a diagnosis of injury to a cervical disc a physician notes objective findings such as neck, shoulder or arm pain, atrophy of muscles, and changes in reflexes including losses of sensation; that the myelograph is a highly reliable test. Upon examination of plaintiff's Xrays he found no indication of any abnormality of the discs in the cervical region; the doctor also examined the Xrays taken during the making of the first discographic test and the later Xrays showing the fusions; in answer to a hypothetical question (he had not examined the plaintiff) he testified that there was no evidence of a ruptured disc "at any level." He further testified: that the test by discogram of the discs in the cervical area had been shown to be "completely invalid," and that this conclusion was settled by experiments made upon volunteers who had no history of neck injury or neck or arm pain; that he, under a grant from the Medical School of Washington University, had conducted tests on fifty such volunteers at the Missouri Penitentiary in October, 1963, with assistance from other doctors; that he had performed discograms on 148 separate cervical discs; he outlined his procedure (including the injections of dye and repeated Xrays) and showed some of the Xrays taken, with his explanations. This phase of the testimony was developed in much detail, but the final result stated was that in 93% of the discs injected there was an "extravasation or leakage" of the dye and that complaints of severe pain were present in all cases; his final conclusion was that, since the results were "almost universally positive" in the tests, it was obvious that the test was not valid as a basis for diagnosis; further, that cervical discography was of "no use at all" and was quite misleading. The results of this study were published in an article in the Journal of the American Medical Association in September, 1964. On cross-examination the doctor stated that he had been quite "suspicious" of the validity of the discogram before he performed the experiments.

The theory of the plaintiff at the trial was that defendant was legally responsible

for the removal of the discs by Dr. Schaerer whether his diagnosis of injury to the discs was correct or not, because the operation was a proximate result of plaintiff's injury in the collision, plaintiff not having been negligent in the selection of a doctor or doctors; and further, that it was improper thus to place conflicting medical theories on trial. These objections were fairly made and carried on throughout the medical testimony. The alleged error in the admission of all testimony seeking to impeach the use of the discogram is the principal point now made here. All such evidence may be considered together.

Plaintiff's basic position is that she sustained an injury in the collision, that she received treatments from various doctors, that the discograms and the removal of the discs were a part of her treatment, and that whether rightly or wrongly diagnosed, defendant was liable for all such acts and their results; this, because the act of the original tort-feasor is regarded as the proximate cause, and that subsequent negligence or improper diagnosis of a treating physician does not break the chain of causation. Thus, plaintiff says, the defendant is liable in any event for the results of the treatment, the controverted evidence was legally immaterial and its admission was highly prejudicial.

█ The principle thus propounded by plaintiff has been very generally recognized. It is briefly stated in Prosser on Torts, 2nd Ed., Ch. 9, pp. 272–273, as follows: "A similar group of cases hold the defendant liable for the results of medical treatment of the injured victim. Even where such treatment is itself negligent, because of lack of proper skill or care, recovery for its consequences is permitted. It would be an undue compliment to the medical profession to say that bad surgery is no part of the risk of a broken leg. So long as the plaintiff himself has exercised reasonable care in his selection of a physician, the defendant will be liable for all ordinary forms of professional negligence, although not for such unusual misconduct as the infliction of an intentional injury, or the performance of an entirely independent operation, which cannot be regarded as normal incidents of the risk."

The subject is exhaustively treated in the note appearing at 100 A.L.R.2d, p. 810, to a lesser extent, in 22 Am.Jur.2d § 113, pp. 163–165, and also in the Restatement of Torts, 2nd, §§ 456–457. The doctrine has long been recognized in Missouri. Elliott v. Kansas City, 174 Mo. 554, 74 S.W. 617; Scholl v. Grayson, 147 Mo.App. 652, 127 S.W. 415; Nagel v. Missouri Pacific Ry. Co., 75 Mo. 653, 42 Am.Rep. 418; Staehlin v. Hochdoerfer, Mo., 235 S.W. 1060; Smith v. Kansas City Rys. Co., 208 Mo. App. 139, 232 S.W. 261; Pitcher v. Schoch, 345 Mo. 1184, 139 S.W.2d 463; Hughes v. Maryland Casualty Co., 229 Mo.App. 472, 76 S.W.2d 1101; State ex rel. Smith v. Weinstein, Mo.App., 398 S.W.2d 41. One of the very early cases declaring the doctrine was Stover v. Village of Bluehill (1863), 51 Me. 439. It has since been recognized and followed almost universally, as indicated in the following cases: Stephenson v. Steinhauer (CA 8); 188 F.2d 432; Harris v. Brian (CA 10), 255 F.2d 176; Seitz v. Heep, 243 Ala. 376, 10 So.2d 150; Ross v. City of Stamford, 88 Conn. 260, 91 A. 201; Smith v. Missouri, K. & T. Ry. Co., 76 Okl. 303, 185 P. 70; Reed v. City of Detroit, 108 Mich. 224, 65 N.W. 967; Pyke v. City of Jamestown, 15 N.D. 157, 107 N.W. 359; Hudgens v. Mayeaux (La. App.), 143 So.2d 606; Kansas City Southern R. Co. v. Justis (CA 5 La.), 232 F.2d 267, 60 A.L.R.2d 628, certiorari denied 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53; Cannon v. Pearson (Tex.), 383 S.W.2d 565; Hicks Rubber Co. v. Harper (Tex.Civ.App.), 131 S.W.2d 749; City of Joliet v. Le Pla, 109 Ill.App. 336; Derby v. Prewitt, 12 N.Y.2d 100, 236 N.Y.S.2d 953, 187 N.E.2d 556; Trieschman v. Eaton, 224 Md. 111, 166 A. 2d 892; Selby v. Kuhns, 345 Mass. 600, 188 N.E.2d 861. In some cases the point has arisen on the propriety of instructions, in others upon the admission or exclusion of

evidence. In the following cases the courts ruled, directly or indirectly, that evidence of aggravation by the negligence of a physician was properly excluded or was improperly admitted, because the defendant was liable for such aggravation in any event, where the plaintiff was not shown to have been negligent: Stephenson, supra; O'Quinn v. Alston, 213 Ala. 346, 104 So. 653, 39 A.L.R. 1263; Wyatt v. Russell, 308 Pa. 366, 162 A. 256; Radman v. Haberstro, 49 Hun. 605, 1 N.Y.S. 561, 17 N.Y.St.R. 497, affirmed 119 N.Y. 659, 23 N.E. 1150; Baker v. Borello, 136 Cal. 160, 68 P. 591; Doran v. Waterloo, C. F. & N. Ry. Co., Iowa, 147 N.W. 1100; Ross v. City of Stamford, supra; Smith v. Missouri, K. & T. Ry. Co., supra; Fields v. Mankato Electric Traction Co., 116 Minn. 218, 133 N.W. 577; Reed v. City of Detroit, supra. Two of the Missouri cases already cited may be considered as so holding. Scholl v. Grayson, 147 Mo.App. 652, 127 S.W. 415; Smith v. Kansas City Rys. Co., 208 Mo.App. 139, 232 S.W. 261. In all of those cases, however, as we interpret them, the original injury was conceded or was clearly and very obviously established, and the negligence of the physician caused only an *aggravation;* such, for instance are the sundry cases involving the improper setting of a fractured bone, with resulting disability. In fact, the very principle stated above basically is that the original tort-feasor is liable for such *aggravation,* it being a part of the proximate, foreseeable result.

■ The application of the doctrine may not be obviated here on account of any demonstrated negligence of the plaintiff. In the profusion of cases on the general subject there is relatively little discussion of the plaintiff's duty. It is often stated that he must exercise reasonable care in the selection of his physician; and a few of the cases suggest, in substance, what is more or less obvious, namely, that if plaintiff selected a duly licensed and practicing physician of good "repute," concerning whom he knows nothing adverse, he is not to be held negligent if, perchance, the physician later proves to be unskillful or negligent. Elliott v. Kansas City, 174 Mo. 554, 74 S.W. 617; Scholl v. Grayson, 147 Mo.App. 652, 127 S.W. 415; Reed v. City of Detroit, 108 Mich. 224, 65 N.W. 967; Smith v. Kansas City Rys., supra; Stephenson v. Steinhauer (CA 8), 188 F. 2d 432; Selby v. Kuhns, 345 Mass. 600, 188 N.E.2d 861; Baker v. Borello, 136 Cal. 160, 68 P. 591. Here the evidence is not too clear as to how plaintiff happened to go to Dr. Schaerer; it is fairly inferable that she was recommended to Dr. Grundmann by a chance woman acquaintance (who had had similar neck trouble) and by her newly acquired attorney; also, that she was recommended to Dr. Schaerer by Dr. Grundmann and the attorney jointly. Only the selection of Dr. Schaerer is material here. He was a regularly licensed physician and surgeon, having served internships and residencies in recognized hospitals, he was a member of various hospital staffs and, as a specialist in neurosurgery, he had been accepted through examination as a diplomate of the American Board of Neurosurgery. Nothing appears in the evidence which is in any way disparaging to him except (if that be such) the controversial nature of the discographic tests used by him. On this evidence we rule as a matter of law that no negligence on the part of plaintiff was shown in the selection of Dr. Schaerer, and defendant was not relieved of responsibility for his acts on that theory.

Defendant's primary contention for the admissibility of the evidence attacking the reliability of discograms is that it was offered to show that plaintiff had suffered *no disc injury.* (At some places in the brief counsel expand this by stating a purpose to show *"no injury,"* but we interpret the real contention to be as first stated above.) Counsel disclaim any intent to disprove mere aggravation of an injury. Defendant introduced evidence tending to show that no symptoms or indications of disc injury were present, and he asserts

that proof of the unrealiability of the discogram was competent to corroborate that evidence.

In the vast majority of cases sustaining responsibility for the aggravation of injuries by negligent or incompetent treatment, there was no controversy about the existence of the injuries treated. Here the issue of disc injury or no disc injury was strenuously controverted; plaintiff undertook, by her own medical evidence, to show the rupture of two discs and that this was caused by the collision. That was her burden, and she made the issue. We have concluded that evidence of the invalidity of the test used by Dr. Schaerer as a mode of diagnosis was admissible as tending to disprove his asserted findings of two ruptured discs, and thus to dispute the existence of that element of damage. Since the evidence was admissible for one valid purpose, it could not properly be excluded; no specific limitations concerning its purpose or effect were requested, so we do not have that question before us. It is possible that a slightly different phase of the question would have been developed if counsel had specifically objected to the testimony of Dr. Holt's experiments on the ground that they were made *after* the plaintiff's last operation; we find no such objection. Moreover, this was evidence on a collateral matter in which the trial court has a large discretion.

Plaintiff says that the defendant has shifted his position on appeal; that at the trial his counsel countered the objections with the statement that the principle stated was not the law, whereas he now admits the basic principle, but says that it was not the purpose or effect of the evidence to counteract aggravation. Be that as it may, we rule on the objections as they come to us and determine whether the evidence was admissible for any legitimate purpose, regardless of such colloquies; and ordinarily a party is not required to state affirmatively a ground for the admission of evidence which he offers, unless the court inquires. There was no reason here why counsel could not have argued to the jury, despite the controverted evidence, the claimed rupture of the discs, the operations for removal, the pain and inconvenience therefrom, and any resulting disabilities; undoubtedly, they did so, and in all probability the jury found against plaintiff on that issue. We note again that this case has come to us upon questions on the admissibility of evidence,—and that is what we have ruled upon.

Plaintiff complains of the refusal to give her Instruction B, a withdrawal instruction, which was as follows: "The evidence of Dr. Earl P. Holt, Jr. to the effect that the two cervical discs, mentioned in evidence, should not have been removed and that part of the testimony of Dr. Earl P. Holt, Jr. and Dr. George Roulhac stating and endeavoring to prove that cervical discography is not a valid diagnostic aid is withdrawn from the case and you are not to consider such evidence in arriving at your verdict." From what we have already said, it is apparent that the court could not properly have thus withdrawn the evidence for all purposes, and the instruction was correctly refused.

Plaintiff's last point is that the verdict of $3,000 is so inadequate as to indicate bias and prejudice on the part of the jury. Counsel say that plaintiff lost at least $4,500 in wages, that she had three major operations, that she has given up various recreational activities, such as fishing, bowling, etc., and that the range of motion in her neck has been restricted. On this contention we view the evidence in the light most favorable to the verdict, and consider also that the trial court was vested with a wide discretion in ruling on the motion for a new trial. Hufft v. Kuhn, Mo., 277 S.W.2d 552. In that case, and also in Brown v. Moore, Mo., 248 S.W.2d 553, Ulrich v. Kiefer, Mo.App., 90 S.W.2d

140, and Boschert v. Eye, Mo., 349 S.W.2d 64, all cited by plaintiff, the injuries suffered were obvious and fully demonstrated; the defendants in those cases offered no controverting evidence. In other words, there was no fact issue in any of those cases as to the existence or extent of the injuries, and the courts were able to consider the alleged inadequacy of the verdicts from that standpoint. Here, on the evidence which we have held to be admissible, there were substantial fact issues: as to the supposed ruptures of the discs; what loss of earnings, if any was directly caused by the collision; whether any of plaintiff's complaints were attributable to pre-existing ailments or conditions; and the possible relationship of a new ulcer condition developed shortly prior to trial. The question of causation was a fact issue existing throughout the case, upon which the burden of proof was on the plaintiff. In Brown v. Moore, Mo., 248 S.W.2d 553, at loc. cit. 559, the Court said: "We must keep in mind that the question of the amount of damages is primarily for the jury. The jury's broad discretion in fixing the amount of the award is conclusive on appeal, especially where the verdict has the approval of the trial court, unless the appellate court can say that the verdict is so shockingly and grossly excessive or inadequate as to indicate that the amount of the verdict is due to passion and prejudice; and that the broad discretion granted to the jury and to the trial court in weighing the evidence has been arbitrarily exercised and abused." Under all the circumstances here, and in view of the various factual issues which the jury was permitted and required to find, we may not hold that this verdict was the result of passion and prejudice. We cannot say that the amount of this verdict was not "responsive to the evidence," as the jury was entitled to view the evidence. Mitchell v. Mosher, Mo., 362 S.W.2d 532.

The judgment is affirmed.

All of the Judges concur.