## JOHN H. BRISCOE v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

**Division One, July 1, 1909.**

1. **NEGLIGENCE: Pleading: General: Former Petition.** Where plaintiff, a passenger on a street car, in his original petition pleaded specific acts of negligence and afterwards by an amended petition pleads general negligence, he is not thereby estopped from relying upon the presumption of negligence.

2. ———: ———: ———: ———: **Not Introduced.** The former petition abandoned by the filing of an amended one, cannot be considered as an admission, unless it is put in as evidence.

3. ———: **Passenger: Unusual Occurrence: Injury: Demurrer.** Wherever something unusual occurs in the operation of a public conveyance carrying passengers for hire, proof of that fact and of a consequent injury to the passenger raises a presumption of negligence on the carrier's part. Where plaintiff shows that he was a passenger, that the car came to a violent stop, so sudden as to break out the windows, and that he was injured, he is entitled to the presumption that the defendant carrier was negligent, and a demurrer to his case cannot be sustained.

4. ———: ———: **Presumption: Instruction.** An instruction telling the jury that if they find that plaintiff was a passenger on defendant's car, that said car was permitted to come to an unusually abrupt, violent and unexpected stop, and that plaintiff was injured, "then it is presumed, in the absence of evidence to the contrary, that said stop was caused or permitted through the negligence of the defendant, and it then devolves on the defendant to show, by a fair preponderance of the evidence, that said stop was not caused or permitted through its negligence," is unobjectionable.

5. ———: **Accident: Instruction.** There was no error in this instruction defining accident: "You are instructed that an accident is such an unavoidable casualty as occurs without anybody being to blame for it, that is, without anybody being guilty of negligence in doing or permitting to be done or in omitting to do the particular things that caused such casualty."

6. **SUBSEQUENT REPAIRS: No Objection.** Where testimony to the effect that repairs were made in the defective conditions immediately after the accident was not objected to as an attempt to show defendant's negligence at the moment of the accident, the incompetency of that testimony will not be considered on appeal. An objection that it was "irrelevant and immaterial" is not sufficient to raise the point that it was an attempt to show an admission of negligence by subsequent repairs.

7. **EXCESSIVE VERDICT: $5,000.** Plaintiff was thrown against a stove in the car and received a slight cut upon the chin; he fell upon the back of his head and received a bruise there. The evidence indicates that the blow on the chin and perhaps to the head were serious. He bled some from the throat at the time, but his attending physician attached little importance to that. The second day after the injury he had considerable fever and for a week his temperature was about 103. His physician says he "suffered from a concussion and contusion of the brain from the blow upon the chin." For over four months he was treated by a physician, who then told him the only remedy was to permit nature to take its course. At the trial, which was five years after the injury, he suffered from headaches, pain in the back of his head, and had a dazed expression, and was absent-minded, and was in bad shape. The physicians for defendant testify that he has Bright's disease, and that none of his present symptoms are traceable to the injury, but are the result of that disease, and this testimony his counsel in no wise attempted to controvert. *Held*, that while the testimony shows plaintiff to be in a serious condition, it also strongly tends to show that many of his troubles are not the result of the accident and that a verdict for $5,000 is too large by $2,000.

Appeal from Jackson Circuit Court.—*Hon. Jas. E. Goodrich*, Judge.

Affirmed on condition.

*John H. Lucas* and *Halbert H. McCluer* for appellant.

(1) The court erred in not instructing the jury to find the issues in favor of defendant. Hoffman v. Railroad, 45 N. Y. App. Div. 586; Allen v. Railroad, 183 Mo. 433; Yarnell v. Railroad, 113 Mo. 580; Keller

v. Railroad, 149 Pa. St. 65; LeBarron v. East Bottom Ferry Co., 11 Allen (Mass.) 312; Farley v. Railroad, 132 Pa. St. 58; Hayman v. Railroad, 118 Pa. St. 508; Fern v. West Jersey Ferry Co., 143 Pa. St. 122; Orcutt v. Century Bldg. Co., 201 Mo. 424; McGrath v. Railroad, 197 Mo. 97; Roscoe v. Railroad, 202 Mo. 588. (2) The court erred in giving each of the following instructions, at the request of plaintiff, viz.: 1, 2, 3, 4, 5, 6, 7 and 8. As to No. 4: Authorities under point one: Schaefer v. Railroad, 128 Mo. 71. As to No. 7: Henry v. Railroad, 113 Mo. 534; Feary v. Railroad, 162 Mo. 99; Maxey v. Railroad, 95 Mo. App. 309. (3) The court erred in admitting the following evidence over defendant's objections, viz.: 1st. Admitting any evidence over defendant's objections for the reason that the petition did not set forth facts sufficient to entitle him to a recovery. Allen v. Railroad, 183 Mo. 433. 2d. Evidence in relation to repairs after the accident. Alcorn v. Railroad, 108 Mo. 90; Hipsley v. Co., 88 Mo. 348; Brennan v. St. Louis, 92 Mo. 482; Standard Milling Co. v. Railroad, 122 Mo. 278. 3d. Evidence of inability to sleep. Coontz v. Railroad, 115 Mo. 674; Thompson v. Railroad, 111 Mo. App. 474. 4th. Evidence as to loss of memory. Thompson v. Railroad, 111 Mo. App. 474. 5th. Evidence of Dr. Freymann as to what caused the injury, and also the evidence of the same witness as to the effects of the injury. Glasgow v. Railroad, 191 Mo. 347. (4) The verdict is excessive and should not be permitted to stand.

*T. B. Buckner, T. J. Madden* and *Bird & Pope* for respondent.

(1) This case was brought and tried on the theory that plaintiff was a passenger and was injured through something unusual in the ordinary operation of the car which the law called upon defendant to explain.

The charge of negligence was that the "car was caused or permitted to come to an unusually abrupt, violent and unexpected stop," whereby plaintiff was injured. This charge was sustained by the evidence, and was not denied by defendant's witnesses. No witness for defendant attempted to account for the sudden stopping of the car, but all of them swore that they did not know what the cause was. Redmon v. Railroad, 185 Mo. 1. When the relationship of carrier and passenger was established, and the abrupt stop and consequent injury to plaintiff was shown, "plaintiff made out his prima-facie case of negligence against defendant and the burden was cast upon defendant of showing that the accident was not the result of that want of care and vigilance which the law makes it obligatory on the defendant to bestow." This is the well-settled law of this State. O'Gara v. Railroad, 204 Mo. 724; Logan v. Railroad, 183 Mo. 605; Magrane v. Railroad, 183 Mo. 119; Malloy v. Railroad, 173 Mo. 75; Holland v. Railroad, 105 Mo. App. 117; Latimer v. Railroad, 126 Mo. App. 70; McRae v. Railroad, 125 Mo. App. 562. The court cannot say, as a matter of law, that the testimony of the defense is true. Gannon v. Gas Light Co., 145 Mo. 516; Minster v. Railroad, 53 Mo. App. 282; Hipsley v. Railroad, 88 Mo. 353; Clark v. Railroad, 127 Mo. 197; Wood v. Railroad, 181 Mo. 444; O'Gara v. Railroad, 204 Mo. 732; Holland v. Railroad, 105 Mo. App. 123. (2) There was no error in permitting witness Bonnot to testify to the sawing off of the plate by the trackmen of the defendant. It was immediately after the wreck, and was evidence of the condition of the cable conduit at the time of the wreck. Logan v. Railroad, 183 Mo. 600; Gutridge v. Railroad, 105 Mo. 529; Weldon v. Railroad, 93 Mo. App. 676; Woods v. Railroad, 51 Mo. App. 503. This evidence was not offered to prove previous negligence, but to show a continuing condition, and explain the cause of the sudden stopping of

the car.   No objection was made by counsel on the
ground that repairs made after the wreck were not
admissible as evidence of negligence of defendant, and
consequently no such objection can be made now.   This
testimony might have been proper to show that de-
fendant owned or operated the track and line.   Bren-
nan v. St. Louis, 92 Mo. 482; Woods v. Railroad, 51
Mo. App. 500.   (3) The verdict was for $5,000.   It
was unanimous and was approved by the trial court.
We think that it was moderate.   The last trial was
nearly five years after the injury and the testimony
of the physician appointed by the court showed plain-
tiff was in very bad condition, and he was getting
worse.   He received a brain injury when he was thrown
down in the car.   He was in bed for several weeks,
and his fever ran up to 102 and 103, and his pulse
to 120, 125, 130, and his pulse was fine and wiry.   This
indicated a serious brain injury.   He was delirious
most of the time while he was confined to his bed.
After he was able to get around he was an entirely
changed man, broken in health, without strength,
energy or ambition.   He suffered continuously from
a grinding pain in his head, and has never been able
to do the work or earn the money that he formerly did.
His walk was slow and sluggish, and he was not right
mentally.

GRAVES, J.—Action for personal injuries.   Ver-
dict and judgment for $5,000 in favor of plaintiff, from
which defendant appeals.

This case at one time reached the Kansas City
Court of Appeals, by which, for errors, it was re-
versed and remanded—118 Mo. App. 668.   Thereafter
an amended petition was filed, upon which the trial
involved in this appeal was had.   The material por-
tions of this amended petition, omitting formal portions
and charges as to the character of the injuries, are:

"That on or about February 3, 1902, and at about the hour of 4:20 o'clock p. m. of said day, plaintiff was a passenger upon one of the west-bound cars of said defendant on said Fifteenth Street line and while he was in the act of taking a seat in the coach of said car and while said car was moving over the tracks of the Kansas City Belt Railway Company's crossing, or what is known as the Belt Line crossing, said car came to an unusually abrupt, violent and unexpected stop and by reason thereof plaintiff was thrown with great force and violence against the stove in said car and to the floor of said car and was thereby seriously injured. . . .

"That said injuries were caused through the carelessness and negligence of said defendant, its agents, servants or employees, in that said car was caused or permitted to come to an unusually abrupt, violent and unexpected stop or collision on or near the Kansas City Belt Line crossing whereby plaintiff was suddenly and violently thrown against the stove and upon the floor of said car."

Answer was a general denial and plea of contributory negligence. Reply, general denial.

The injury sued for in this case occurred February 3, 1902. Plaintiff, at the time, was assistant superintendent of the Colonial Security Company, as well as a solicitor for the same. Such company seems to have been of a questionable character as a business proposition for the investors in its contracts or bonds. Plaintiff was earning about $35 per week in this dual capacity. On the evening of February 3, 1902, at about four o'clock, the plaintiff took passage upon one of the defendant's cable trains going west on its Fifteenth Street line. He got on the train at Cleveland avenue to the east of the point where defendant's street car tracks crossed the tracks of the Belt Line Railway Company. From Cleveland avenue to the crossing of the tracks is about a block and a half.

Plaintiff says that when he got on the platform of the car he had trouble in getting the door of the car to open. That the car was almost stopped just before it reached the Belt Line tracks, but started up again at the full speed of the cable. That after he got into the car he started toward the stove to get a seat, when all at once the car came to a sudden and violent stop, by which he was violently thrown against the stove and knocked thereby back to the floor of the car. From this fall he received the injuries sued for herein, which will be noted more in detail later. Plaintiff says that the sudden stop of the car was so violent as to break out all the window lights. He also says that one Peeples was standing on the platform of the car. This witness described the movement of the car in this language:

"Q. Where did you get on the car? A. I got on the car on the east side of the track the car stopped on—the east side of the track right where I was standing.

"Q. Where was the front end of the car when it stopped on the east side of the track with reference to the Belt Line tracks? A. It was right about the first rail of the Belt Line tracks, near the east side as near as I can remember.

"Q. What kind of a stop was made there when you got on—describe it? A. Well, I don't know about that—they stopped is all I know—pulled up there and stopped. . . . This time they stopped and I stepped on and they moved about twenty feet, pretty rapid gait and stopped dead still.

"Q. That was the second stop? A. Yes, sir.

"Q. Where was the second stop? A. That was right in the center of the tracks—the car was right—set over both tracks.

"Q. Where was the front end of the car with reference to those tracks at the second stop? A. That was over the second track—the west track.

"Q. Now, describe that second stop as to force and suddenness and what happened. A. Well, they stopped dead still and I had stepped up on the platform and was still facing south and had not turned to get in the car and my shoulders and head went through the window and I went down in the corner, and cut me a little here and I was bruised up a little.

"Q. What effect did it have on the windows of the car? A. It broke the window—shattered it all to pieces and bent the rods."

He also said he thought the car was going the full speed of the cable when it suddenly stopped, and that he did not know whether other windows were broken or not, except the one against which he was thrown. After the accident he was called by two acquaintances to a near-by dramshop and took solace by imbibing a drink of whisky, and this perhaps accounts for the fact that he failed to see plaintiff, as he says he did not see plaintiff at the time.

The flagman for the railroad company also testifies to the sudden stopping of the car. Plaintiff offered some evidence tending to show that the grip on the car struck an iron plate which was along the side of the cable conduit and indented that place. That immediately after the accident workmen for the defendant sawed off the corner of this plate.

Defendant's testimony tends to show the plaintiff had been in the car ample time to have gotten a seat; that there were only two or three passengers on the car; that the employees, five or six in number, who examined the situation just after the accident, found no cause for the car stopping; that only the one window on the east end was broken; that there was a bent "king-bolt." On cross-examination of the gripman who was in charge of the car, this "king-bolt" is thus spoken of:

"Q. Will you please, Mr. Riner, tell the jury where that bolt was? A. The king-bolt is right back

of the grip—the small iron pin that goes down and helps hold the grip-hanger in place and keeps it from sliding sideways.

"Q. Is the king-bolt down in the conduit or above? A. It is above. The gripman could put his hand on it or foot—the bolt is a small rod.

"Q. How big a bolt was that? A. Well, it is only about eighteen inches long. It is just a small bolt in diameter, not very big.

"Q. How big? A. Oh, possibly half an inch or less—possibly three-eighths.

"Q. And that king-bolt was bent? A. Yes, bent 'to one side enough to throw the grip out of plumb. The grip has to hang just plumb or it won't hold the rope—when you bring it up and let it go.

"Q. You don't know what bent it? A. No, sir.

"Q. It wasn't bent when you started out? A. No, sir—not in my judgment.

"Q. It was bent in that collision. A. As far as I know it was—I suppose it was.

"Q. You had let go of your rope before that collision, hadn't you? A. The rope was throwed in the grip when I left the barn by what is known as a gypsy and that was the first time I had let loose of the rope—that is, released the rope or throwed the rope. I had made a slow-down stop at Cleveland, but I didn't release the rope, but merely loosened it so it would slip through. That was the first time I had let the rope go through.

"Mr. Buckner: Read the question and see if he can answer it.

"(Question read by stenographer). Q. Can't you answer that question? A. Yes, sir. There at the Belt Line I let loose of the rope.

"Q. And your grip wasn't on the rope at all. A. No, sir."

For the defendant it was further made to appear that cars usually ran across this crossing at slackened

speed; that cars had passed both ways that day and had no trouble; that the crossing was properly constructed; that the motorman was running the car in the usual manner at the time of the accident; that the crossing had been inspected that morning and found all right; that nothing was found wrong after the accident; that the gripman did not even hear that plaintiff or any one was injured; that the stop in question was not violent. Other facts especially as to the character of the injuries will be noted under the discussion of the points made by defendant, for reversal of the judgment.

This sufficiently states the conflicting proof to discuss the legal questions. The instructions so far as required will be noted in the course of the opinion.

I. Among other things the defendant contends that, inasmuch as the plaintiff pleaded specific acts of negligence in his former petition, he is thereby estopped in now pleading general negligence and relying upon the rule *res ipsa loquitur,* as to presumptive negligence. It further contends that, inasmuch as it is shown by the original petition that the plaintiff pleaded specific negligence, he thereby admitted knowledge of the cause of the accident, and cannot now rest upon presumptive negligence, after showing a state of facts which would invoke the usual rule in case of passenger and carrier.

We take it there are two questions in this case that were settled in the recent case of Price v. Railroad, 220 Mo. 435; i. e., that the petition involved here is one of general negligence as distinguished from specific negligence and (2) that the previous acts of the plaintiff have not estopped him from relying upon presumptive negligence under his pleadings herein. A rediscussion of the questions at this time is unnecessary.

222 Sup— 8

But going a step further, the record herein does not disclose the fact that the original petition was introduced in evidence, so that whatever it may have been, it cannot be considered here. True it is that under given circumstances an abandoned pleading may be taken as an admission of the pleader, but for that purpose it must be put in evidence in the same manner as any other admission.

II. Defendant insists that its demurrer to the evidence should have been sustained. This question must be considered in the light of the pleading and proof. By the pleading as above indicated the plaintiff has placed himself in position to invoke the doctrine of presumptive negligence.

Having so done, the sole question in this regard is whether or not he has shown a state of facts which brings him within the rule *res ipsa loquitur.* In other words do the things by him shown bespeak, upon their face, negligence? Going a step further, if the jury find the facts surrounding the accident to be as he details them, then are they such as will entitle the plaintiff to rest upon the presumption that the defendant has been in some manner negligent? We are of opinion that they are. In the first place an unusual and violent stop was testified to by his witnesses. So violent was it, according to plaintiff, that the glass in the windows of the car was shattered and broken. This was the plaintiff's evidence, and this we must consider in passing upon the question of a demurrer to the evidence. The fact of a violent and unusual stop, with the consequent injury to plaintiff, is sufficient to require of the defendant an explanation of its conduct, both as to the safety of the conveyance and the track, and also as to the manner of the operation of the car or train. Wherever something unusual occurs in the operation of a public conveyance carrying passengers for hire, proof of such facts and

a consequent injury to the passenger raises the presumption of negligence. The mere injury to the passenger is not sufficient, but proof of that fact and further proof of an occurrence which is out of the ordinary, is sufficient to make a case under the rule of presumptive negligence. Plaintiff's evidence in this case shows a violent and sudden stop of the car, a thing not usual. The violence of the stop, by the fact that it threw one passenger against a window with such force as to not only break the glass, but to bend the protecting iron rods. Not only so, but, if plaintiff himself is to be believed, all the windows of the car were shattered. Plaintiff, under the rule of presumptive negligence, might have stopped with this showing, after having shown consequent injury to himself. He, however, did not stop here, but showed in addition that the car was run over the crossing at the full speed of the rope, which according to defendant's testimony was violative of the rule of the defendant. His evidence also tended to show that an iron plate had become so misplaced as to have been struck and "dented" by the grip shank. Considering the showing made there was no error in refusing to sustain the demurrer to the evidence, either upon the close of plaintiff's case, or upon the close of the whole case.

III. It is next urged that there was error in giving instruction numbered 4 for plaintiff. This instruction in effect told the jury that if they found that plaintiff was a passenger upon defendant's car, and said car was permitted to come "to an unusually abrupt, violent and unexpected stop" and the plaintiff was injured thereby, "then it is presumed, in the absence of evidence to the contrary, that said stop was caused or permitted through the negligence of the defendant and it then devolves upon the defendant to show by a fair preponderance of the evidence that said

stop was not caused or permitted through its negligence.''

A similar, although broader, instruction was held in judgment in the Price case, *supra,* and our cases thereon reviewed. To what was then said we need add nothing now. Under that ruling this instruction is unobjectionable.

IV. Nor was there error in giving instruction numbered 7 for the plaintiff. This instruction reads: ''You are instructed that an accident is such an unavoidable casualty as occurs without anybody being to blame for it, that is, without anybody being guilty of negligence in doing or permitting to be done or in omitting to do the particular things that caused such casualty.''

We are of opinion that this instruction comes fairly within the law as declared in paragraph one of the opinion in Zeis v. Brewing Assn., 205 Mo. l. c. 648. To this paragraph all the judges in Court In Banc agreed, although there was much disagreement as to other paragraphs of the opinion. There was no error in giving this instruction.

V. Another contention is that the plaintiff was permitted to prove that immediately after the accident the defendant repaired the tracks at or about the place of the accident. One of the things so shown was the sawing off of a corner to the steel plate mentioned in our statement. It is now urged that this proof was made as tending to show negligence upon the part of the defendant at the time, and that proof of repairs made after an accident cannot be shown for the purpose of fixing an admission of negligence upon the part of the defendant to the effect that it was or had been negligent at the date of the accident. We are cited to the cases of Hipsley v. Railroad, 88 Mo. 348; Brennan v. St. Louis, 92 Mo. 482; Alcorn v. Railroad, 108 Mo. 81, and Mahoney v. Railroad, 108 Mo. l. c. 200.

It will not be necessary to discuss these cases or this evidence in relation to the case law upon the subject. We have gone over the objections made to the introduction of this proof, and at no place is it urged that the evidence was incompetent for the reason now assigned. The first objection was to the effect that such testimony was "irrelevant and immaterial" and words of similar import. Some more specific objections were made, but at no time did counsel object to this testimony on the ground that plaintiff was improperly trying to show defendant's negligence at the moment of the accident, by showing repairs immediately made thereafter. So that the question is not really before us upon a proper objection and exception. In these cases we usually have questions enough wherein the matter has been properly called to the attention of the trial court, without going into questions to which the attention of the trial court was not called at the time, by proper and definite objections. This contention is therefore ruled against defendant.

VI. Defendant complains of a number of refused instructions, four or more of which practically amount to a direction to find for the defendant. We have gone through the instructions given and refused, and are impressed that defendant was more than fairly treated in the matter of declarations of law. In fact, the court gave some instructions for defendant to which it was not entitled under the law, and we see no error in those refused.

VII. The serious question in this case is the amount of the verdict. Plaintiff was thrown against the stove and received a slight cut upon the chin. He also says that he fell upon the back of his head and received a bruise there. We are inclined to think that he received a more or less serious injury by this blow to the chin and perhaps to the head. He bled

some from the throat at the time, but his attending·
physician, who testified, placed but little stress upon
that injury.    The second day after the injury the
plaintiff had considerable fever and for a week his
temperature was around 103 degrees.    Dr. Freymann,
his physician, says that he was then evidently suffer-
ing from "a concussion and contusion of the brain
from that blow upon the chin."    There is evidence
tending to show that he suffered at the trial from
head aches, pain in the back, and that he had a dazed
expression, and loss of memory to some extent.    The
trial from which this appeal grows 'was had in Janu-
ary, 1907, and all the witnesses agree that the plaintiff
appeared to be in bad shape at that time and no doubt
was, but the real trouble is as to the cause.    His physi-
cian treated him for about four or five months, part
of the time at his home and later at the office, and
ceased to treat him, telling him that it would take
time for nature to do the work.    His physician says:

"Q.    For how long a time did he come to see
you?    A.    Oh, several months—four or five months.
"Q.    You have seen him from time to time at
these trials?    A.    Yes, sir.
"Q.    You have had him under observation?    A.
In that respect—I haven't seen him for a long time
now—for a year and a half; I don't know whether it
is a year and a half or two years.
"Q. From what you saw of Mr. Briscoe there, and
this concussion of the brain, can you state what the
effects were in Mr. Briscoe's case?    The effects you
noticed and observed in his case?    A.    I have observed
that he appeared dazed, especially in a dazed condi-
tion; but of course, I couldn't tell, never having known
him before and not knowing anything about his condi-
tion before—I couldn't be so able to tell as I would be
able to tell if I had known him before; but he looks
dazed, and sometimes absent minded.

"Q. Now, Doctor, you may state—you said he was delirious for about a week? A. Yes, sir.

"Q. What does it mean among doctors and medical men for a patient to have a temperature, as you say Mr. Briscoe had, of 102 to 103? A. Temperature means different things in different diseases, and in brain troubles it means a great deal more than it would in malarial fever.

"Q. Why? A. I don't know why. . . .

"Q. Now, Doctor, when did you cease giving him medicine? A. I don't know—I think it was probably six months afterwards—may be three or four months.

"Q. In troubles like Briscoe had, tell the jury whether or not there is any known course of treatment by medicine that will produce a speedy cure? A. I don't think so, and told him so. I told him he had to wait for time to do the work that it was going to do.

"Q. Now, considering the length of time that has elapsed—you see him now, do you not? A. Yes, I see him.

"Q. You may state whether or not you still notice this dazed condition you spoke of? A. Yes, sir.

"Q. You may state whether or not you still notice this absent-mindedness you spoke of? A. Yes, he was up in the office about two weeks ago—something like that I think—and he talks in the same way; he talks all right, but he runs off on something once in a while.

"Q. Now, considering his present condition and the length of time it has continued, you may state whether or not that trouble is permanent in this case, or otherwise? A. It looks that way to me."

On cross-examination, the doctor testified to having visited him at the house for about thirteen days and then that within a couple of weeks thereafter he came to the office and he gave him at different times five or six prescriptions. That since then he had

never examined him professionally. Plaintiff was in Colorado for sometime between the date of injury and this last trial and says he was treated there, but no medical testimony was produced from that place.

For the defendant, Dr. Punton examined the plaintiff in 1904, and again in 1907 during the trial. From the plaintiff he got the history of his case. He says the plaintiff was no doubt in bad condition at the date of the last trial, but that his condition was not of traumatic origin. Dr. Punton goes into detail as to all the troubles of which plaintiff complained at the time of the two respective examinations. On the last examination the urine was examined and found heavily laden with albumen. Plaintiff complained of his eyesight, sleeplessness and nervousness, and this physician says that plaintiff was in his judgment suffering from Bright's disease of the kidneys. He says that everything of which the plaintiff complains are symptoms of such disease. Among these troubles was one of the heart. This physician testified positively that none of the existing symptoms were due to traumatic or physical force.

Plaintiff made no effort to rebut this evidence. He had his own family physician there and failed to have him testify on this point. He did not even have his own physician examine him from the date of the first treatment to the date of the trial. We are satisfied that plaintiff received some injury at the hands of the defendant, but the peculiar silence of his own physician upon the cause of the alarming symptoms existing at the time of the trial is significant. His physician at no time explicitly states that the alarming symptoms of which plaintiff complained at the last trial were due to his injury. Skilled lawyers tried his case, and if there was no evidence of Bright's disease in plaintiff's symptoms, proof of that would have been forthcoming after the testimony of Dr. Punton. Lawyers do not usually leave their case in an un-

certain condition when within an hour or two an examination could have been had and the theory of Bright's disease removed from the case. Their failure is very significant. Defendant ought not to be held for sufferings and conditions not superinduced by its own conduct. We are of opinion that whatever may be the plaintiff's condition now, it is not all due to defendant, but to the ravages of that most insidious of all diseases. We are forced to the conclusion that this verdict is largely excessive, and believe that three thousand dollars will amply compensate the plaintiff for all damages done by defendant. If plaintiff will in ten days remit two thousand dollars from this judgment as of the date of its entry, the remainder of three thousand will be affirmed as of the date of its entry, otherwise the judgment will be reversed and the cause remanded. All concur.