FLORENCE McCAFFERY, Plaintiff-Respondent, v. St. Louis Public Service Company, a Corporation, Defendant-Appellant, No. 42737—252 S. W. (2d) 361.

Court en Banc, October 13, 1952.

Rehearing Denied, November 10, 1952.

*Salkey & Jones* and *Carroll J. Donohue* for appellant.

*Keegan & Rickhoff* and *Gregg W. Keegan* for respondent.

548

COIL, C.—This is an appeal by defendant-appellant from a judgment for $20,000 entered on plaintiff-respondent's verdict in her suit for personal injuries allegedly sustained when she was a passenger on defendant's streetcar.

Instruction 1, given at the instance of plaintiff, was a res ipsa loquitur submission. Defendant contends that plaintiff's evidence proved specific negligence and that the trial court therefore erred in giving the instruction. Plaintiff does not here contend that defendant joined in a submission under the rule of res ipsa loquitur and has thereby waived its right to complain of the instruction, but contends that her evidence did not prove specific negligence. We shall, therefore, rule the case on the issue joined.

Plaintiff testified that she boarded defendant's northbound Park line car at 18th and Market Streets. With her was Mr. McKeever, a friend of long standing. They sat in the third seat to the rear of the center door on the right, Mr. McKeever on the outside. They intended to ride three blocks to Olive Street and transfer to a westbound streetcar. At some point south of Olive, Mr. McKeever signaled the operator, arose, and went to the center door. Plaintiff rose to a standing position, grasping the bar on the back of the seat in front of her, when there was a "horrible noise", a "sharp banging", a jolt which tore loose her grip and threw her across the aisle against a seat and then into the aisle where she landed on her back with her head to the rear and feet to the front. The car came to a stop or the jolt occurred some distance south of Olive, probably when it was two thirds of the distance between Pine Street (the first street south of Olive) and Olive.

Defendant concedes that the testimony of plaintiff alone did not prove specific negligence, but contends that the testimony of Mr. McKeever, a witness for plaintiff, constituted substantial proof of specific negligence. We shall therefore state in some detail the testimony of this witness.

He said that he left the seat which he and plaintiff were occupying when the streetcar was between Pine and Olive Streets, the car having stopped at Pine. When he reached the center door, he looked around and plaintiff was standing at the seat in which they had been sitting. He then looked again toward the center door and then the car gave an "extra ordinary terrific and violent jolt". He looked back where plaintiff had been standing and saw her going to the left side and then hit the floor. This occurred when the streetcar had moved a little more than half the distance between Pine and Olive. The occurrence took place about 11:05 or 11:10 p.m., the night was clear and the weather dry, and it was slightly upgrade from Market to Olive. He could not accurately estimate the speed of the streetcar immediately [363] before the occurrence, but judged it to be between 15 and 25 m.p.h.

The following questions and answers were asked of and made by the witness:

"Q. After this sudden jolt occurred there and Mrs. McCaffery went to the floor can you tell us whether or not the street car travelled any distance? A. Well of course the brakes were shattering and it proceeded a short distance until he was able to release them and then he moved a little further forward.

"Q. He moved a little further forward then? A. Yes and stopped.

"Q. And he came to a stop? A. Yes after the jolt after the release of whatever was the trouble there he proceeded a short distance and then he stopped like and proceeded again toward Olive Street and

when he made the final stop he was about approximately fifteen to twenty feet short of the building line.

"Q. From Olive Street? A. That is right. * * *

"Q. Now can you tell us whether or not this man that was operating that car did he come back to where you people were in that car or did you go up to the front, just tell us what occurred there? A. Well the operator was in front and he only came from around the shade and after we got straightened out he said leave by the front door. * * *

"Q. Now you said something before about these brakes on that street car were shattering, is that right? A. That is right.

"Q. What did you mean by that? A. Well noise that when something, tension is brought against, like a brake shoe against the circumference, against the wheel with the car still trying to move but the tension is still against the wheel and naturally it throws a shatter.

"Q. In other words that would be sort of like this, is that what you mean noise like that? A. Grinding.

"Q. Yes. About how long did that last? A. Well lasted long enough to— Q. I know it is hard to judge, if you could give us your best judgment I would appreciate it sir? A. Well seconds that is all. Q. Just for seconds? A. Yes.

"Q. And then was it, I am not sure that I got this straight exactly, was it before that shattering started or after the shattering started that the jolt took place? A. Well now I could not see the operator and I could not see what pressure or how he was handling the air control but however when he first applied the brakes is when that big and heavy violent jolt took place.

"Q. And then it was a shatter after that, is that right? A. That is right. Q. Could you tell us about how far the car moved while this shattering was going on? A. Well of course his brakes was still under tension and I couldn't say.

"Q. Just your best judgment? A. Well he probably moved several, I can't say several feet but he moved some distance. Some distance is one or two feet or— Q. You didn't measure it? A. No.

"Q. O.K. Mr. McKeever then again if I understood you correctly when the shattering ceased the street car stopped for a moment? A. Yes.

"Q. And then started up again? A. Then he had his brakes fully released and then he proceeded.

"Q. Up to a point which I believe you said was about fifteen feet from the corner? A. That is right.

"Q. And when the street car stopped up at the corner was there anything unusual about the manner it stopped up there? A. Well they brought it to a stop I would say it was just about the way he stopped at that point."

It is the testimony set out in question and answer form which defendant contends constitutes proof of specific negligence. Such testimony summarized is, in effect, this: when the operator applied the brakes, there was a violent jolt; thereafter the brakes chattered for some seconds which sounded like a brake shoe rubbing against the wheel when the car was trying to move—it was a "grinding" noise; the car moved possibly one or two feet while chattering, and thereafter the brakes were fully released and the car moved forward some distance and then came to a stop.

In the first instance, this testimony relating to brakes must be considered in the light of the testimony of the witness to the effect that the operator was hidden from the witness' view by a shade and that therefore the witness did not see the operator prior to or during the occurrence, and in the light of the further testimony of the witness to the effect that he didn't know what was the specific trouble. So viewed, and when it is further noted that no qualifications were shown in evidence to establish the competency of the witness to testify to his conclusions, based as they obviously were on sounds he heard and sensations he felt, it may well be said that this testimony relating to brakes and braking is nothing more than the conclusions of the witness which embody his idea of what may have happened on the occasion in question as opposed to any actual knowledge as to what did happen.

But for the purposes of this case, we shall assume that Mr. McKeever was qualified to state his conclusions from what he heard and felt or that, even if he was not so qualified, in the absence of objection by plaintiff to these parts of his testimony, plaintiff was bound by the witness' conclusions for the purpose of determining whether such testimony proved specific negligence.

Making this assumption, a fair analysis of this testimony requires the conclusion that it establishes or proves only that the violent jolt was caused by the application of brakes by the operator. This testimony does not prove or establish whether the effect of this application of brakes, i.e., the jolt, was caused by improper manipulation of the apparatus by the motorman, and, if so, in what manner improper, or by improper functioning of the braking system after proper manipulation of apparatus by the motorman. Clearly this testimony did not prove or tend to prove one of these permissible inferences, i.e., some negligence in operation, any more than it proved or tended to prove another permissible inference, i.e., some negligence in maintenance of the braking system. And clearly this testimony did not prove what specific negligence, either in operation or maintenance of the brakes and braking system, caused the jolt and plaintiff's resulting injuries.

In this type of case, if plaintiff proves the carrier-passenger relationship, the exclusive control of the vehicle by defendant, a violent and extraordinary jolt and lurch, and that he sustained injuries as a

proximate result, he has adduced sufficient circumstantial evidence from which a jury may infer that the cause of plaintiff's injuries was some negligence on the part of the defendant. If plaintiff goes further and proves that the *effect* of braking caused the jolt, he has eliminated any permissible inference that the jolt was the result of defendant's negligence in colliding with or striking an object, but he has thereby strengthened the permissible inferences that the jolt was due to some negligence in the operation of the braking apparatus, or in the maintenance of the braking system, or because the jolt was by reason of a sudden stop made necessary by a third-party situation which some negligence of defendant created. If plaintiff goes further and proves that the braking system or mechanism was at the time in proper operating condition and that there was no third party which made necessary a sudden stop, he has eliminated any permissible inference that the jolt was caused by negligence in maintenance of the braking system, and any permissible inference that the jolt was caused by negligence in creating a condition which made a sudden stop and jolt unnecessary, but he has thereby strengthened the permissible inference [365] that the jolt was caused by some negligence of the operator in the operation or manipulation of the brake apparatus. If plaintiff goes further and proves that the operator jammed the brake lever suddenly and as far as it would go, that he knew or should have known that such action would be likely to result in a violent jolt, and that the operator so acted under circumstances making this action unnecessary and improper, he has proved the specific negligence which caused his injury and must recover, if at all, on the specific negligence proved.

Plaintiff in the instant case (even giving the testimony of the witness Mr. McKeever the most favorable possible construction from the standpoint of defendant) went no further than to prove that the jolt was caused by the effect of brakes applied by the operator. What specific negligence on defendant's part caused the jolt was not shown; it remained for the jury, if it so found, to infer at the very least that the jolt was caused by some negligence of defendant in the operation of the braking apparatus or some negligence in the maintenance of the braking system.

Many cases have been cited by defendant in support of its contention that the proof adduced by plaintiff constituted proof of specific negligence. And, of course, plaintiff has cited many cases supporting her contention that specific negligence was not proved. We have examined all the cases cited[1] and others. It would serve no useful pur-

---

[1] Cited by defendant: Hoeller v. St. Louis Public Serv. Co., Mo. App., 199 S.W. 2d 7; Grimes v. Red Line Serv. Co., 337 Mo. 743, 85 S.W. 2d 767; Berry v. Kansas City Public Serv. Co., 343 Mo. 474, 121 S.W. 2d 825; Powell v. St. Jos. Ry., Light, Heat & Power Co., 336 Mo. 1016, 81 S.W. 2d 957; Fuller v. St. Louis Public Serv. Co., Mo. App., 245 S.W. 2d 675; Lukitsch v. St. Louis Public Serv. Co., 362 Mo. 1071, 246 S.W. 2d 749;

pose to, and the consumption of the space involved makes it unwise to, analyze the cases and compare them with each other and with the instant case. This, because there is no doubt of nor dispute about the 'principle contended for by defendant and not disputed by plaintiff, that if plaintiff proves specific negligence, he may not submit his case under the rule of res ipsa loquitur; and because in final analysis, each case must be ruled upon the evidence in that particular case; and because none of the cases cited by defendant compels or requires a different conclusion but, on the contrary, many of the cases cited by plaintiff and others support our conclusion.

We have said that none of the cases cited by defendant compels or requires a result different than we have here reached. While, for reasons hereinafter stated, we deem this an accurate statement, nevertheless there is language contained in the recent majority opinion of the Court en Banc in the case of Lukitsch v. St. Louis Public Service Co., 362 Mo. 1071, 246 S.W. 2d 749 (cited by defendant) which, unless construed in connection with the particular facts of that case, is opposed to the conclusion we have reached in the instant case. Likewise of [366] language contained in the concurring opinion in the Lukitsch case, supra. In our view, the language to which we refer and later quote was unnecessary to a decision in the Lukitsch case, i.e., to determine the correctness and propriety of the emergency instruction there under consideration. That is to say, the instruction was proper or improper, independent of and wholly unaffected by whether plaintiff proved specific negligence. Be that as it may, however, we think the Lukitsch case, properly construed, simply means that in that particular case the evidence excluded any reasonable inference of negligence on the part of defendant in bringing about the emergency and excluded any reasonable inference of any negligence other than negligence, if any, in the manner in which defendant's bus operator applied the brakes. But the opinion at page 752, 246 S.W. 2d, contains this

Riley v. St. Louis Public Serv. Co., Mo. App., 245 S.W. 2d 666; Duncker v. St. Louis Public Serv. Co., Mo. App., 241 S.W. 2d 64; Venditti v. St. Louis Public Serv. Co., 360 Mo. 42, 226 S. W. 2d 599; Williams v. St. Louis Public Serv. Co., Mo. App., 245 S.W. 2d 659; Lochmoeller v. Kiel, Mo. App., 137 S.W. 2d 625; Heidt v. People's Motorbus Co., 219 Mo. App. 683, 284 S.W. 840; McGrath v. St. Louis Transit Co., 197 Mo. 97, 94 S.W. 872; Dashman v. St. Louis Public Serv. Co., Mo. App., 239 S.W. 2d 553. Cited by plaintiff: Belding v. St. Louis Public Serv. Co., 358 Mo. 491, 215 S.W. 2d 506; Mueller v. St. Louis Public Serv. Co., 358 Mo. 247, 214 S.W. 2d 1; Moehle v. St. Louis Public Serv. Co., Mo. App., 229 S.W. 2d 285; Hale v. St. Louis Public Serv. Co., Mo. App., 238 S.W. 2d 876; Whitaker v. Pitcairn, 351 Mo. 848, 174 S.W. 2d 163; Powell v. St. Jos. Ry., Light, Heat & Power Co., supra; Glasco Electric Co. v. Union Elec. L. & P. Co., 332 Mo. 1079, 61 S.W. 2d 955; Price v. Metropolitan St. R. Co., 220 Mo. 435, 119 S.W. 932; Semler v. Kansas City Public Serv. Co., 355 Mo. 388, 196 S.W. 2d 197; Briscoe v. Metropolitan St. R. Co., 222 Mo. 104, 120 S.W. 1162; Hurley v. Mo. Pac. Transp. Co., Mo. App., 56 S.W. 2d 620; and Malone v. Greyhound Lines, Mo. App., 22 S.W. 2d 199.

language; "Furthermore, plaintiff undertook to prove, and did prove, that the sudden jerk of the bus was caused by a sudden application of the brakes. Therefore, both by her petition and by her proof she debarred herself from the right to recover under the res ipsa loquitur doctrine in its true sense." The concurring opinion in the case at page 756, 246 S.W. 2d, contains this language: "I think the plaintiff's evidence in this case, viewed most favorably to plaintiff, shows the precise and specific act of the bus operator as the sole cause of plaintiff's fall. That act, so shown by her evidence, was the sudden application of the brakes resulting in a sudden stop." These expressions, standing alone, do apparently mean that when a plaintiff-passenger shows by evidence that a sudden stop of a vehicle was caused by the operator applying the brakes, then such plaintiff has thereby proved specific negligence. Our opinion in the instant case is in conflict with Lukitsch in so far as that case so holds and to that extent the Lukitsch case should no longer be followed.

Defendant makes the further contention that the trial court erred in refusing to discharge the jury for the alleged improper injection of "insurance" into the case. The record discloses that after the trial court had asked some questions on voir dire and inquired whether there were further questions, plaintiff's counsel, out of the hearing of the jury, stated:

"MR. KEEGAN: For the purpose of properly qualifying this jury and for that purpose I would like to ask Mr. Gartner whether or not the Transit Casualty Company, an insurance company, has any interest in the outcome of this litigation? MR. GARTNER: The answer is yes.

"MR. KEEGAN: I propose to ask one general question and will not ask it immediately upon leaving the bench and will not put undue emphasis or single it out in the course of my examination. THE COURT: All right."

Plaintiff's counsel then asked the members of the panel various questions pertaining to their qualifications and then asked: "Anyone on this panel who has any interest financial or have you ever been employed by the Transit Casualty Company, an insurance company, which offices in the Buder Building at Seventh and - -."

Out of the hearing of the jury, counsel for defendant said: "I am asking the court to discharge this jury panel and declare a mistrial for the reason that although proper foundation was laid for asking the jury about the insurance company, undue influence was made in the tone of Mr. Keegan's voice and furthermore emphasizing not only about Transit Casualty, but repeating that it was an insurance company." The court refused to discharge the jury. There was no other mention of the Transit Casualty Company, insurance company, or insurance, during further examination on voir dire.

The question presented is a very narrow one. It is simply this: did the trial court abuse its discretion in overruling defendant's motion to discharge the jury where counsel for defendant properly laid a foundation to inquire concerning the jury's interest in or connection with Transit Casualty Company because counsel, in asking the question, characterized Transit Casualty Company as an insurance company [367] in the one general question propounded?

Many cases have been cited by the parties but none of them present the factual situation which here obtains and thus they are important only in that they announce or reiterate the general determinative principles involved. It is now well established that counsel for plaintiff may inquire on voir dire examination to ascertain whether any of the prospective jurors have an interest in or connection with an insurance company which is interested in the defense of the case on trial, provided that in the judgment of the trial court the inquiries are properly made and for the legitimate purpose of determining the qualifications of the jurors to sit in the case. Decker v. Liberty, Mo. Sup., 39 S.W. 2d 546, 547[1]; Olian v. Olian, 332 Mo. 689, 692[1], 59 S.W. 2d 673, 674[2].

It is likewise established that the injection into a case of the fact that a litigant is covered by a policy of insurance is error, and often reversible error, unless the issues in the case make the fact of insurance relevant. Pitcher v. Schoch, 345 Mo. 1184, 1196, 139 S.W. 2d 463, 469, [13, 14]; Olian v. Olian, supra, 59 S.W. 2d 674[3].

In the instant case counsel for plaintiff characterized the Transit Casualty Company as an insurance company at the time he indicated to the court and opposing counsel his intention of asking the question. There was no objection at the time to the characterization nor any suggestion that counsel should not so characterize Transit Casualty Company when the question was asked. We do not mean that defendant's counsel was necessarily put on notice that the question when asked would designate the company in the exact manner it had been designated when plaintiff's counsel indicated his intention to ask the question. But the fact that plaintiff's counsel characterized Transit Casualty Company as an insurance company when laying the foundation for the question on voir dire examination clearly indicates that plaintiff's counsel was in good faith, not only in the purpose of his question but in the language used in propounding it. There was, of course, no reason to characterize Transit Casualty Company as an insurance company. The important fact which plaintiff's counsel wanted to establish and could legitimately establish, was whether any prospective juror had a financial interest in or had been employed by Transit Casualty Company. Any juror whose answer was in the affirmative would necessarily know that Transit Casualty Company was an insurance company. And as to those jurors whose answers were

in the negative, the nature of the business of Transit Casualty Company was of no concern. The very thing to be avoided (the disclosure of the fact of insurance) was unnecessarily accomplished.

We are of the opinion that it was improper to characterize Transit Casualty Company as an insurance company. But we are also of the opinion that this characterization in the one general question propounded by counsel for plaintiff under the circumstances of this case could not have been prejudicial or certainly not so prejudicial as to convict the trial court of an abuse of discretion in refusing to discharge the jury because of this question. The circumstances mentioned and which we have in mind are that the trial court, who was in a position to know, was of the opinion that plaintiff's counsel had used no undue inflection of voice in asking the question; that plaintiff's counsel asked only the one general question and did not again refer to Transit Casualty Company or any other insurance company during voir dire examination, during the trial of the case, or in argument to the jury; that there is nothing in the record to indicate the bad faith of plaintiff's counsel in including in his question the characterization of the company inquired about as an insurance company; and finally, and contrary to the suggestion of the trial court, we believe that any panel of jurors would know that Transit Casualty Company was in fact an insurance company and thus the characterization of it as such would be harmless. Pitcher v. Schoch, supra, 139 S.W. 2d 468[12], 469[13, 14]; May v. Hexter, Mo. App., 226 S.W. 2d 383, 385[1, 2].

██ ██ During the direct examination of plaintiff, her counsel was inquiring as to whether she had ever had a claim or received any money arising out of any prior accident. Plaintiff answered that in a prior year, she thought 1947, a door closed on her, but that she had filed no claim for damages. This then occurred:

"Q. Was there any claim filed? A. No no claim filed.

"Q. Just tell us what occurred, did some man later come out to see you? A. Yes there was somebody from the insurance company or the Public Service Company I guess.

"Q. Were you under the care of any doctor at that time? A. No.

"Q. Did you—did they pay you anything? A. Yes, sir."

Further questions and answers established that she received $40 and a release was given and that, other than that, she had had no claim of any kind in her life. Counsel for defendant, out of the hearing of the jury, then moved for a mistrial because of the "unwarranted statement regarding the insurance company or public Service Company and stating it in that manner * * * ." Plaintiff's counsel denied any purpose in having insurance company mentioned and any knowledge that it was to be mentioned. The court refused to declare a mistrial and defendant contends here that the court erred. We think a recounting of the incident sufficiently establishes the fact that the trial court did not abuse its discretion

in refusing to declare a mistrial. The incident related to an accident occurring some four years prior to trial and some two years prior to the accident which was the subject of the trial. The answer of the witness was not responsive, and there is nothing to indicate that counsel for plaintiff intended to elicit the answer given. Counsel was apparently attempting to show that, while no claim had been filed, nevertheless a representative voluntarily sought out plaintiff and she received $40 as a result of the incident. No objection was made immediately after the answer in question was given nor was any request made of the court to strike the answer or to instruct the jury to disregard it. While we do not mean that counsel for defendant did not act promptly enough in moving for a discharge of the jury, we do note that there was no request of the court for action short of discharge of the jury. This is the kind of an incident in which the trial court must exercise its discretion. The record shows that the trial court was of the definite opinion that no prejudice had resulted sufficient at least to justify a discharge of the jury. We cannot say that the trial court abused its discretion. Jones v. Missouri Freight Transit Corp., 225 Mo. App. 1076, 1084, 40 S.W. 2d 465, 470; Carter v. Rock Island Bus Lines, 345 Mo. 1170, 139 S.W. 2d 458.

Defendant contends that a combination of the voir dire incident mentioned above and this incident required a mistrial on the theory that this unsolicited mention of insurance company by plaintiff reminded the jury of the voir dire question concerning Transit Casualty Company. We do not in any sense condone a mention of insurance in a case wherein the issues do not require it or make it proper. But we are of the opinion that the voir dire incident and this incident, singly or in combination, were not sufficiently prejudicial to convict the trial court of error in refusing to discharge the jury because of them.

Plaintiff's prayer for damages was for $20,000. The jury returned a verdict for $25,000 and the trial court entered judgment for $20,000, the amount of the prayer of the petition. Defendant says that the verdict as returned by the jury "is so grossly excessive as to indicate passion, bias and prejudice on the part of the jury against defendant". The jury was not informed of the amount sought by plaintiff. The fact that the amount of the verdict returned by the jury exceeded the amount sued for is not in and of itself evidence of passion or prejudice on the jury's part against the defendant. Defendant, in its motion for new trial, alleged as one of the grounds thereof that the verdict was so grossly excessive as to evidence the fact that it was the result of passion, prejudice, and misconduct on the part of the [369] jury. The trial court overruled defendant's motion and thereby found that the verdict in the sum of $25,000 as returned by the jury did not, under the

circumstances, indicate passion, prejudice, or misconduct. Our examination of the record fails to disclose anything which would indicate that the verdict as returned resulted from passion or prejudice on the part of the jury toward defendant or resulted from misconduct of the jury. Excessiveness of a verdict, even gross excessiveness, does not necessarily establish misconduct or passion and prejudice on the part of a jury. We may not weigh the evidence and infer prejudice and bias from the size of the verdict. Hancock v. Kansas City Terminal R. Co., 347 Mo. 166, 173, 146 S.W. 2d 627, 629[2], 630[3]; Abernathy v. St. Louis-San Francisco Ry. Co., Mo. Sup., 237 S.W. 2d 161, 164[5, 6]; Stokes v. Wabash R. Co., 355 Mo. 602, 610[11], 197 S.W. 2d 304, 309.

Defendant also contends that the verdict of the jury as reflected in the judgment for $20,000 is excessive. Plaintiff, 51 years of age at the time of trial, was an auditor and for eleven years had been employed by the United States government at a yearly salary at the time of trial of $3725. She was injured on October 29, 1949, the trial took place on March 5 and 6, 1951. Plaintiff testified that as a result of the fall, she was in a dazed but not unconscious condition; that she, with the assistance of her friend, Mr. McKeever, arrived at her home by streetcar 30 or 40 minutes after the accident where she immediately went to bed; that shortly pain in the back of her neck and headaches occurred which continued intermittently through the night; that the next day, Sunday, she remained in bed applying hot applications to her neck; that on Monday she went to work by cab but failed to complete the day, leaving to see Dr. Lincoln Hirst who gave her a hypodermic, diathermy treatment, and massage; that on Tuesday she returned to work but was able to stay only two hours. Thereafter she was away from her work for six weeks and since returning has had "flare-ups" necessitating her absence for two or three days at a time. She took advantage of a termination period in her employment on June 23, 1950, and as a result was away from work for two months and two weeks, being reinstated on September 18, 1950. The evidence is not clear whether this absence from work was due to her physical condition or due to the necessities of her employer. In any event, she returned to see Dr. Hirst on Wednesday following the accident, at which time he adjusted some "rib lesions"; her neck was beginning to swell. Dr. Hirst, an osteopath, sent her to Dr. Lee Ford, an orthopedic surgeon, on the following Friday. Dr. Ford, in turn, sent her to Dr. Wendell G. Scott for X rays. As a result of Dr. Ford's examination, he prescribed a Thomas collar to be worn when indicated, which she continued to wear for the entire period of six weeks and which she has continued to wear when at home to the time of trial. He also prescribed traction for her neck to be administered at her home by means of a pulley arrangement with a weight on one end for the

purpose of stretching her neck. He prescribed this traction three times a day for twenty minutes each, which she administered as directed and, as we understand, continues occasionally to do. Dr. Ford later prescribed a shoulder brace, which is a canvas and steel-ribbed affair, which extends over and from her shoulders down to her waist, which she has worn and continues to wear.

She has continued to see Dr. Hirst three times each week since her accident to the date of trial, on each of which visits he administered heat treatment and sometimes gave her intravenous injections. She saw Dr. Ford once a week for a month, then twice a month for a period of time, and then approximately once a month to the time of trial. She was examined by Dr. Jerome Simon twice and once each by Dr. Olney Ambrose and Dr. John Patrick Murphy. Since returning to work after the six weeks' absence, and with the exception of the period noted during which she was away due to termination of her employment, she has been unable to lift the heavier voucher books which she is required to use in her employment. She has had, and [370] continues to have, intermittent pains in her neck, head, right shoulder, and left arm. She also suffers sharp pains in her left leg and has had the nerves in her leg anesthetized three or four times. She is unable to sit for any length of time without pain and finds it necessary to get up and move around. She wakes every hour or two during the night because of "terrible headaches." She testified that she was in excellent health at the time of the injuries in question and never before had had any pain in her neck or shoulder. She has lost wages of about $800, as we understand, after having used all her accumulated sick leave and annual leave. Plaintiff's injuries have been continuously painful. She has paid or become obligated for doctor bills in the sum of $650. Plaintiff sustained no fractures and was not hospitalized.

Drs. Scott, Ford, Simon, Ambrose, and Hirst testified on behalf of plaintiff. Defendant adduced no medical testimony, although Dr. Ambrose had made an examination of plaintiff at the request of defendant. Plaintiff's medical evidence shows that she sustained an aggravation of a pre-existing arthritic condition in the cervical spine; that the painful condition as a result of this aggravation will be permanent although such pain will be intermittent and probably there will be a lessening in the intensity and frequency of pain; that she sustained a subluxation, that is, a partial dislocation, of the clavicle or collarbone where it joins the sternum or breastbone. This condition will be permanent and painful unless surgically corrected. In this connection, Dr. Ford had recommended surgery which, if done, will consist of exposing the right end of the collarbone and chipping away 1-1/2" or 2" of it which now protrudes. In the doctor's opinion, such an operation would relieve symptoms of pain in that region.

There was evidence that plaintiff is suffering from osteoarthritis in both her knees, but Drs. Hirst and Ford testified that they had treated plaintiff for this condition prior to the accident.

X rays of the cervical spine disclosed the osteoarthritic condition referred to and it was the opinion of all the doctors who testified that this condition pre-existed plaintiff's injuries. X rays also showed a narrowing of the intervertebral space between the fifth and sixth cervical vertebrae and, in the opinion of one doctor, a slight narrowing of the space between the sixth and seventh cervical vertebrae. Dr. Ford, an orthopedic surgeon, testified that in his opinion this narrowing pre-existed the injury and was the result of degenerative changes in the spine. Drs. Ambrose and Simon were of the opinion that the narrowing between the fifth and sixth cervical vertebrae could have been caused by the trauma sustained in the accident or could be the result of degenerative changes.

Plaintiff did not testify to any tingling or numbness in the fingers of her right hand, but Dr. Simon testified that on his first examination plaintiff complained of numbness and tingling in the second and third fingers of the right hand and a pain in the lower left limb from the ankle to the hip; that on his second examination, plaintiff complained of numbness and tingling also in the fourth and fifth fingers of the right hand. Dr. Simon was of the opinion that this was consistent with pressure on the nerve centers due to the narrowing of the space between the fifth and sixth cervical vertebrae. Drs. Ford and Ambrose testified that plaintiff made no such complaints to them and that their examinations failed to reveal any sensory disturbance.

The doctors expressed opinions to the effect that plaintiff would require medical attention for a long period of time, perhaps permanently; that she has suffered some pain in the lower back; that she would require an operation to relieve pain in the region of the sterno-clavicular joint; that an operation of the cervical spine is not indicated, but on the contrary, heat treatments, baths, massage, and other conservative measures are indicated for the pain resulting from the arthritic condition in the cervical spine; that plaintiff will have slight permanent limitation of motion in her neck, permanent intermittent pain in her neck and possibly some pain in her [371] upper extremities; permanent pain in the region of the sternoclavicular joint and permanent protrusion of the collarbone, unless surgically relieved.

While we view the evidence as to injuries from the standpoint most favorable to plaintiff, we may not conclude that a jury could reasonably find, based upon plaintiff's medical testimony, that the narrowing of the intervertebral space or spaces in her cervical spine was the result of trauma sustained in the accident in question, nor

may we conclude that the arthritic condition in plaintiff's knees resulted from this accident.

Defendant and plaintiff have cited the cases[2] listed in footnote 2 supporting their respective contentions that the judgment is and is not excessive. We have examined all these cases. None of them, of course, is like, and few of them are fairly comparable to, the instant case from the standpoint of the seriousness and permanency of injuries sustained. Most of the cases cited by plaintiff involved injuries far more serious than those of plaintiff in the instant case.

It is, of course, most difficult to determine in any given case whether a particular judgment is excessive. But having regard for some fair uniformity of judgments, taking into consideration the fact that the trial court has approved this judgment in the amount of $20,000, considering the fact that the amount of damages to be awarded in any given case is primarily the concern of the jury, and taking into account economic conditions and all other factors which have to do with our right to interfere with a jury's verdict, we are of the opinion that the maximum amount which plaintiff should recover in this action is the sum of $12,000.

If, therefore, within fifteen days of the filing of this opinion, plaintiff will enter here a remittitur of $8,000, the judgment will stand affirmed in the sum of $12,000 as of the date of the original judgment. Otherwise, the judgment will be reversed and the case remanded for a new trial.

█ PER CURIAM:—The foregoing opinion of COIL, C., is adopted as the opinion of the Court en Banc, except that it is ordered by the Court en Banc that the maximum amount that plaintiff should recover in this action is the sum of $16,000.00. If, therefore, within fifteen days of the filing of this opinion, plaintiff will enter here a remittitur of $4,000.00, the judgment will stand affirmed in the

---

[2] Cited by defendant: Arno v. St. Louis Pub. Serv. Co., 356 Mo. 584, 202 S.W. 2d 787; Lange v. St. Louis Pub. Serv. Co., 361 Mo. 74, 233 S.W. 2d 641; Osburn v. K.C. Sou. Ry. Co., 360 Mo. 813, 230 S.W. 2d 856; Carpenter v. Wabash R. Co., 335 Mo. 130, 71 S.W. 2d 1071; Welch v. Thompson, 357 Mo. 703, 210 S.W. 2d 79; Schuler v. Newhoff, 276 App. Div. 887, 93 N.Y.S. 2d 810; Yellow Bus Line, Inc. v. Brenner, 31 Tenn. App. 209, 213 S.W. 2d 626; Burke v. Commercial Standard Ins. Co., La. App., 38 So. 2d 644; Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S.W. 2d 333; Ice Co. v. Tamm, 90 Mo. App. 189. Cited by plaintiff: Easterly v. American Institute of Steel Construction, 349 Mo. 604, 162 S.W. 2d 825; Phegley v. Graham, Mo. Sup., 215 S.W. 2d 499; Potashnick v. Pearline, Mo. Sup., 43 S.W. 2d 790; Hein v. Peabody Coal Co., 337 Mo. 626, 85 S.W. 2d 604; Hilton v. Thompson, 360 Mo. 177, 227 S.W. 2d 675; Gieseking v. Litchfield & M. R. Co., 344 Mo. 672, 127 S.W. 2d 700; Hillis v. Home Owners' Loan Corp., 348 Mo. 601, 154 S.W. 2d 761; Hoelzel v. Chicago, R. I. & P. R. Co., 337 Mo. 61, 85 S.W. 2d 126, 340 Mo. 793, 102 S.W. 2d 577; Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S.W. 2d 408; Gately v. St. L.-S. F. R. Co., 332 Mo. 1, 56 S.W. 2d 54.

363Mo.—36.

562

sum of $16,000.00 as of the date of the original judgment. Otherwise, the judgment will be reversed and the cause remanded for a new trial. *Hyde, Dalton, Leedy* and *Tipton, JJ.,* and *Ellison, C.J.,* concur; *Hollingsworth* and *Conkling, JJ.,* concur in result.